CENTRAL BANK & TRUST CORPORATION et al. v. CLEVELAND et al.

(Circuit Court of Appeals, Fourth Circuit. July 19, 1918.)

No. 1612.

1. RECEIVERS ⬯40—PUBLIC UTILITIES—RECEIVER'S CERTIFICATES.

In considering the question of appointment of a receiver for a public utility corporation, the court will assume, unless it otherwise appears, that it can be operated so as not at least further to impair the value of assets, and will direct it to be operated, even by the issue of receiver's certificates, until arrangements can be made to meet the exigencies of its stoppage.

2. RAILROADS ⬯215—OPERATION—PROCEEDINGS TO COMPEL—OPERATION AT LOSS.

Where a small branch railway has for some years been running at a loss, and has been unable to pay indebtedness, residents, who are neither stockholders nor creditors, cannot require continued operation of such railroad.

Appeal from the District Court of the United States for the Western District of South Carolina, at Greenville; Joseph T. Johnson, Judge.

Bill by the Central Bank & Trust Corporation as mortgagee, against the Greenville & Western Railway Company, for foreclosure and sale of the railroad. Upon appointment of a receiver and an order discontinuing operation of trains, R. Mays Cleveland and others intervene. From an order appointing a co-receiver of the defendant, and directing receivers to issue receivers' certificates, the Central Bank & Trust Corporation and others appeal. Remanded for modification.

Joseph A. McCullough, of Greenville, S. C. (McCullough, Martin & Blythe, of Greenville, S. C., on the brief), for appellants.

C. F. Haynsworth, of Greenville, S. C. (H. J. Haynsworth, of Greenville, S. C., on the brief), for appellees.

Before KNAPP and WOODS, Circuit Judges, and SMITH, District Judge.

SMITH, District Judge. This is an appeal from an order appointing a co-receiver of the defendant the Greenville & Western Railway Company, and directing the receivers to issue receivers' certificates not to exceed the sum of $3,000, and use the proceeds thereof, or so much as may be necessary, in repairing the roadbed of the railway, so as to make it safe to operate trains over the same, and, as soon as trains can be safely run over the road, to resume the operation thereof. It

⬯For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

appears that the Greenville & Western Railway Company, owner of a small railway covering some 23 miles of railway in the state of South Carolina, in Greenville county, had paid no interest on its first mortgage bonds, and had also for some years been running at a net loss every year, which net loss aggregated on the 31st day of August, 1917, the sum of $41,589.99. A bill was filed by the Central Bank & Trust Company, as mortgagee, in the District Court of the United States for the Western District of South Carolina against the Greenville & Western Railway Company for the foreclosure and sale of the railroad, and the application of the proceeds to the payment of the first mortgage bonds. Under this bill a receiver was appointed, and subsequently, on the application of the receiver to the effect that the road was in an unsafe condition, and that since the appointment of a receiver it had been operated at a loss, the judge of the District Court ordered that the receiver be authorized to discontinue the operation of trains over the road until the further order of the court. Thereupon a petition was filed in the court by a number of residents and property owners along the line of the railroad, asking the leave of the court to intervene, and that the court should rescind its order authorizing the discontinuance of the operation of the railroad, and that the receivers should be directed to continue the operation of the railroad. This intervention was permitted by the court, and an answer filed to the petition, and on the hearing of it, and the testimony taken under it, the presiding judge made the order from which this appeal is taken.

It appears that all parties interested in the railroad are before the court—the mortgagee for the bondholders, the unsecured creditors, the railroad company, and its stockholders. It further appears that the amount of bonds outstanding secured by the mortgage is largely in excess of any possible value of the railroad and its assets; its outstanding first mortgage bonds alone being in amount $460,000, with a large amount of unpaid interest. It further appears that these interveners are people who are neither stockholders, nor creditors, nor bondholders of the railroad company, but simply outsiders, residents along the line of the railroad, who are discommoded by its nonoperation, and who now attempt to assert their claim as the right of the public to have the railroad operated. The contention of these interveners is that, under the law, the court can compel (as the state of South Carolina in their view can compel) the operation of the railroad, although its operation is at a continuous loss, and may mean a continuous impairment and ultimate possible entire loss of all the capital invested in the railway. The logical consequence of their contention is that the effect of subscribing to the capital, or lending on the application of a railroad company, and its construction therewith, is to subject all the property of the corporation to a first lien to the state for the indefinite operation of the road, and, although its operation may prove to be unprofitable and at a loss, the owners of the property, or the holders of securities secured by a lien upon the property, cannot cease operation and realize on the security, but they are bound to continue the operation of it, even to the entire exhaustion of the assets of the railroad.

Upon this point the controversy is between all the persons who have

any financial interest in the property on the one side, and on the other only the interveners, who have no financial interest in the property, but claim the right on behalf of the public to compel the operation of the railroad upon the theory that in the case of a railway the public has a right to compel its operation, even if the result be the sequestration of the entire amount invested without compensation to the owners. This court has authoritatively declared its view to be the contrary of this contention.

A railroad was formerly constructed along the very line of the railroad now concerned. Its name was the Carolina, Knoxville & Western Railway Company. The operation of the railroad having proved unsuccessful, and that it could only be operated at a loss, foreclosure proceedings were instituted, in the Circuit Court of the United States for the District of South Carolina, for foreclosure and sale, and a sale at auction was ordered. It was twice exposed for sale at auction without any bidders, and it was finally bid in for $15,000. The purchaser did not attempt to operate it, but sought to remove and sell the rails. Thereupon a number of persons, relators, acting in the name of the state, just as in the present cause, intervened and sought to have the court require the rails taken up and sold to be replaced by the purchaser and the road to be operated.

The case came on to be heard before Judge Simonton, sitting in the Circuit Court. The very point was made that is made in the present case, that under the statute of the state of South Carolina referred to in the order of the learned judge below, slightly modified as embodied in section 3117 of the Code of Laws of South Carolina, the purchaser of a railroad was required to organize and put it in operation within 60 days of the purchase and acquisition thereof, and that that meant that the stockholders accepted an obligation to maintain and operate, and keep on operating, although the operation was at a loss. After a full hearing Judge Simonton decided to the contrary. Jack v. Williams, 113 Fed. 823. He held that, while a railroad was in a sense a·public concern, for whose construction and operation the action of the sovereign was needed, yet that, whilst thus serving the public, no corporation or person is thereby bound to continue the service without a reasonable remuneration. No one can be compelled to serve the public for nothing. Private property of no kind, including railroad property, can be used for public purposes without compensation. He decided, further, that the effect of the act of the Legislature referred to was not to forfeit or sequestrate the property of a railroad company to the use of the public, by requiring its operation even at a loss, but only that, if the purchasers did not organize and operate within the time limited, they forfeited the franchises of the railroad corporation. The state could not compel the stockholders to exhaust their assets in the operation of a losing concern, but it could say that, if you do not choose to operate, you shall not be entitled to the public franchises given to a common carrier, and in that case the only thing left to the owners of the property would be to sell the property, without being able at the sale of the property to sell the franchises and the right of operation.

That decision was appealed from, but was affirmed by this court.

State of South Carolina v. Jack, 145 Fed. 281, 76 C. C. A. 165. This court affirmed the judgment of Judge Simonton, and the only question would be whether it be so that it be established that the road cannot be operated except at a loss to the owners. This court further held in that case that the very fact that the road does not pay the expenses of running trains was persuasive evidence that the service to the public did not require it to be kept in operation. The learned judge below in the present cause in his order finds as a conclusion of fact that the railroad has lost money from the beginning, but voices his belief that, notwithstanding previous losses, the receivers should issue a sufficient amount of receivers' certificates to put the railroad in condition to run trains over it, and that the interest of the public made this service imperative, and that he is bound to believe that such service would be equally beneficial to bondholders.

Were this the case of a private corporation, there would be no difficulty. The rule is generally accepted in the case of private financial corporations that, without the assent of the existing lienholders, a court of equity will not, by the issue of receivers' certificates, displace prior liens, save to the extent actually required for necessary expenditures incident to administering the assets and preserving the property from deterioration pending the winding up of the business and the settlement of the receivership. The whole rule is fully discussed in International Trust Co. v. Decker Bros., 152 Fed. 78, 81 C. C. A. 302, 11 L. R. A. (N. S.) 152, cited and reaffirmed in Nowell v. International Trust Co., 169 Fed. 505, 94 C. C. A. 589. It seems, also, generally accepted that, where a receiver is directed to operate a business, it is because the income of operation will, as clearly shown by the facts, exceed the outgo, and the operation therefore be beneficial to the holders of the liens; the income being the primary fund to which the expenses of a receivership must be referred.

In the case, however, of public utility corporations, especially in the cases of railways, the rule has been modified by reason of the interest that the public have in the operation of the concern. In the case of a great railway corporation, for instance, if suddenly its operation were put an end to, all the avenues of transportation and trade around which public life and interests had grown up and clustered for many years, would be destructively paralyzed by a sudden stoppage. So, also, in the case of a receivership of a large public utility corporation for the furnishing of gas, water, or other public necessity to a community—its sudden stoppage would entail such untold injury to the community that the stoppage is not permitted; and the theory has been adopted that, unless it manifestly appears otherwise, the very existence of the utility corporation shows that it can be operated at sufficient income to pay its cost of operation and not to impair the value of the property.

[1] This does not mean, however, in these cases, that the courts have a right to require an indefinite operation, to the exhaustion of the assets, but that, in view of the fact that the public utility corporation has been created and exists, the court will take it for granted that it can be operated so as not at least further to impair the value of the as-

sets, and will direct it to be operated, even by the issue of receivers' certificates, until arrangements can be made to meet the exigencies. If it should be found that it cannot be operated, except at a loss, it would be open to the public, if it be authorized as a public measure, to condemn the property and take it for public purposes at its ascertained value; but it cannot take it by the method of requiring its operation to the absolute exhaustion of the assets, and in that way effect the taking of private property for public purposes without compensation.

There has been no case in which such a doctrine has been announced. For the general rule, see Barton v. Barbour, 104 U. S. 126, 26 L. Ed. 672; Union Trust Co. v. Illinois Midland Co., 117 U. S. 434, 6 Sup. Ct. 809, 29 L. Ed. 963; Kneeland v. American Loan Co., 136 U. S. 89, 97, 10 Sup. Ct. 950, 34 L. Ed. 379; Thomas v. Western Car. Co., 149 U. S. 95, 13 Sup. Ct. 824, 37 L. Ed. 663; V. & A. Coal Co. v. Central R. R. Co., 170 U. S. 355, 18 Sup. Ct. 657, 42 L. Ed. 1068. The principle decided in these cases extends to the effect that certain classes of debts already incurred for operating expenses may, by reason of the public right and necessity for operation, be given priority in payment over mortgage liens, under the view also that, like supplies advanced or repairs made to a vessel, they had been actually necessary to preserve the existence of the res itself, upon the existence of which res all other liens depended.

The present case, however, does not fall in any of these categories. In the first place, it is a small branch railroad, and it is not the public, as a general whole, which is affected, but only the limited number of individuals who are connected with the neighborhood of a small branch railroad. Next, the facts show that it is unreasonable to expect this railroad to be operated, so as to pay its costs of operation, except as a speculative hope. The only grounds upon which expectations are based that it can be operated so as not to entail further loss by the operating expenses being greater than the operating receipts is a speculative hope that business may be built up so as to have this result. This is not a conclusion based upon past operation, but a hope voiced upon speculative contingencies. The railroad, therefore, is in the same position as the line referred to in the previous case, when it was ordered in the previous decree of this court to be sold.

[2] The insistence of the relators in this intervention is in effect that private property should be taken for public use without compensation. All the owners of this property, stockholders, unsecured creditors, and bondholders, all object to its further operation and the creation of this prior lien. The only ground upon which it can be justified in the face of further objection is that there is some superior right of the public to have the road operated, although at the destruction of the property of the security holders. This doctrine was openly announced by the counsel for appellees at the hearing. If the residents along the railway, or the public generally, desire that the railroad should be operated for their benefit, they can do so by supplying the income for that purpose, without making it a prior charge upon the property. The operation of the property otherwise than by the crea-

tion of a prior lien in the issue of receivers' certificates would not appear to be practicable under the circumstances in this case. It would seem that the judge below should direct that the test of whether or not its operation would be successful, in the sense of procuring enough to pay for the expense of operation, should be at the charge and at the expense of the persons to be benefited and who insist upon that operation. It should be required of the parties for whose benefit the railroad is thus to be operated, to secure the receipt of a sufficient amount to pay for its operation without creating any prior charge on or further depreciating the value of the assets of the corporation and security holders by the furnishing of such security as the court will require, so that no ultimate loss shall be upon the parties interested in the property.

This can be effected by the requirement that, before the operation of the railroad be resumed and continued, and the certificates issued, sufficient security be given on behalf of the relators for the repayment of these certificates, and of all loss or impairment of value that may result from the operation, less any increased value that at any sale may be shown to have accrued to the security holders from any expenditures for permanent repairs or betterments, or from the sale of the property as a continued operating railway. The cause must therefore be remanded to the court below for a modification of its order, so as to accord with this opinion.

Modified.

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes