GASSER *v.* GARDEN BAY RAILWAY CO.

1. RAILROADS—CARRIERS—MORTGAGES—VESTED RIGHTS.

The incorporation of a private railroad by the owners, and its assumption of the obligation of a common carrier, could not affect vested rights under a prior mortgage.

2. SAME—FRANCHISE—CONTRACTS — OBLIGATION — MUNICIPAL CORPORATIONS.

Where a franchise from a township to a lumber company, the owner of a railroad constructed for the purpose of transporting its own products, granting the right to construct, maintain, and operate the same for a period of 30 years, contained no language implying an undertaking on the part of the company to construct or operate such road, and in the construction of the road no right or privilege granted by the franchise was exercised, there is no obligation upon defendant railway company, as assignee, to continue its operation during the franchise period.

3. SAME—EQUITY—JURISDICTION.

The equity court has jurisdiction to entertain the application of a railroad company to abandon operation and dismantle its line, where its receipts are inadequate to pay operating expenses and pay interest on its mortgage indebtedness.

4. SAME—ABANDONMENT—PUBLIC SERVICE CORPORATIONS.

A railroad company, having been incorporated as a common carrier, and having secured permission from the railroad commission to issue stock, and having entered upon the operation of its line under the implied duty to the public to continue its operation as a public service corporation, could not thereafter, in less than 18 months after its last hearing before the commission relative to its stock issue, arbitrarily abandon operations, permanently discontinue the assumed service, and dismantle the road without the consent of the State through its constituted authority.

5. SAME—PUBLIC SERVICE CORPORATIONS.

The State can, and generally will, when possible, enforce the continuous exercise of such granted corporate powers for public service and benefit, even though unprofitable or at a loss to the corporation, except under special circumstances where peculiarly equitable considerations justly warrant permitting abandonment.

6. SAME—MORTGAGES—FORECLOSURE—RECEIVERS—POWERS.

In proceedings to foreclose a mortgage on a railroad, which had assumed the duties of a common carrier, where it was purposed to dismantle and abandon the road, the decree of the court below appointing a receiver to conserve the property is affirmed, but reversed as to giving him authority to borrow money on certificates with which to repair, equip for operation, and operate the road as an experiment to determine whether it could be operated at a profit.

7. SAME—EQUITY—RIGHTS OF INTERVENERS.

Intervening petitioners, residents of the village and township through which the road ran and others, are equitably entitled to have all of the property of the railroad offered for sale as an entirety on condition that the purchaser operate said road as a common carrier.

8. SAME—DECREE—CONDITIONAL SALE—RIGHTS OF CREDITORS.

The decree of the court below providing that the bid for such conditional sale should be sufficient to pay a certain judgment, and the amount due on the mortgage, with interest, and costs of suit, is amended in this court to include also the proven indebtedness of intervening creditors for fuel and rent of rolling stock used in operating said road.

9. SAME—DECREE—ABANDONMENT.

    The decree providing that if no sufficient bid for the conditional sale is received, after waiting one hour, the property is to be offered in separate parcels, is affirmed.

Appeal from Delta; Flannigan, J. Submitted January 22, 1919. (Docket No. 82.) Decided April 3, 1919.

Bill by Wilbert W. Gasser against the Garden Bay Railway Company and others for the foreclosure of a mortgage and the discontinuance of defendant railway as a common carrier. The people of the State of Michigan and others intervened relative to the discontinuance. From the decree rendered, defendants appeal. Modified, and affirmed.

*Alex. J. Groesbeck,* Attorney General, and *Leland W. Carr,* Assistant Attorney General, for the people.

*Joseph F. Cuddy,* for defendant township of Garden.

*James C. Wood* and *H. J. Rushton* (*G. R. Empson,* of counsel), for appellants.

STEERE, J. The vital proposition presented in this case involves the further existence and continuance for public service of the Garden Bay railway which is about 13 miles in length, extending northerly from a small hamlet called Garden, on Big Bay de Noc in Delta county at the north end of Green Bay, and a junction point on the Soo Line railroad called Cook's Mill.

The following findings by the learned circuit judge who heard the case well outlines the essentials for a general understanding of the nature of the controversy and the salient questions of fact and law involved, with the attitudes of the parties litigant in relation thereto:

"For the transportation of logs from its lumber lands to its sawmill, located at Vans Harbor, Delta county, the Vans Harbor Land & Lumber Company, a manufacturing corporation, under the laws of Michigan, constructed a logging road, which extended in a general northeasterly direction from Vans Harbor.

"Subsequently the lumber company, acting through certain of its stockholders, applied for and obtained, from the township of Garden, which is an organized township of the county of Delta, a franchise to construct a railroad with all necessary sidetracks, switches and terminals, 'on, over, across or alongside of, public highways, streets, alleys and public places of Garden township, and, for the period of thirty years to maintain and operate the same, employing in the movement of cars or trains thereon, steam engines, gas engines, electricity or other motive power.'

"After the franchise was obtained, the logging road was further extended in Garden township and over a portion of the township of Inwood, Schoolcraft county, to a junction with the Minneapolis, St. Paul & Sault Ste. Marie Railway, at a station on the latter road known as Cook's Mill.

"Following the extension of the road to Cook's Mill, the lumber company continued its operation for some years, but the time came when, finding itself without a timber supply sufficient to warrant further operation of the sawmill, they wound up their lumbering operations and offered the railroad property for sale.

"In February or March, 1914, the defendant, Ewald, who, at the time, was cashier of a bank at Garden, procured an option for the purchase of the railroad property at $35,000. He was given possession with the right to operate upon paying a stipulated rental until the option was accepted or surrendered. After operating alone for a short time, he formed a partnership with the defendants Wood, Bourke and Begole. The partnership, to which the option was transferred, continued the operation of the road under the option until May, 1915, when they purchased.

"In conflict with the claim of Ewald, that a somewhat larger price was paid, it was asserted during the arguments, and conceded, that the actual price paid was $30,500, of which $500 was paid in cash then

or previously and the balance of $30,000 by the seven notes of the copartners for two, three, four, five, six, seven and eight thousand dollars, payable in one, two, three, four, five, six, seven and eight years, with interest at six per cent. per annum, payable annually, secured by a mortgage of all the property acquired by the copartnership from the lumber company.

"The partnership continued the operation of the road until October 27, 1915, when they organized the defendant, the Garden Bay Railway Company, under the provisions of Act No. 35, Laws 1867, as amended, known as the street railway act.

"The object of the railway company, according to its articles, was to acquire and operate a railroad in the counties of Delta and Schoolcraft, for the carriage for hire, of passengers, freight, mail and express. Its authorized capital was $25,000, divided into 250 shares of $100 each. The entire capital was subscribed by the members of the copartnership, each taking 62½ shares.

"The defendant, the Garden Produce Company, a Michigan mercantile corporation, was also organized by the members of the copartnership, who subscribed all of its stock, each taking an equal amount. The object of the produce company, not as stated in its articles, but by its organizers, was to create business for the railway by purchasing and shipping on the railroad, property which otherwise would go out by water. While kept separate on their books, the business of both companies, as a practical matter, was handled together as a single business.

"In addition to the right of way, tracks and appurtenances, the conveyance of the lumber company to the partnership embraced a tract of land in Garden, comprising twelve acres, which abuts on Bay de Noc, and on which is located a dock, certain warehouses and other valuable buildings, and also another tract of land in Garden of about seventeen acres along one side of which the railroad runs.

"The copartners deeded these lands, the dock and various buildings thereon and the water privileges thereof to the Garden Produce Company and the balance of the property acquired by them from the lumber company to the railway company.

"During the time the road was operated by the partners, the only rolling stock owned by them consisted of one flat car, one gasoline track repair car and five hand cars. Its remaining rolling stock equipment was a steam locomotive and combination passenger and baggage car, rented from the Soo Railway. For the transportation of forest products and freight, generally, of which there was considerable, Soo line cars were brought in.

"Upon its organization the railway company continued the operation of the road without addition to its rolling stock equipment until about June 15, 1917, when it petitioned the railway commission for leave to cease operations and to take up and dispose of the material in the roadbed. An order was entered by the commission, denying the petition not as it would appear on the merits, but on the ground as a member of the commission wrote the officers of the railway, that the application should have been addressed to the courts and not to the commission on the advice of the attorney general, who, it turns out, supposed the railway company to have received a bonus for construction which it had not. Soon after receiving notice of the denial of its petition, the railway company ceased operation of the road and has not since resumed.

"The first installment of principal of the mortgage, amounting to $2,000, due May 14, 1916, and the semi-annual interest due November 15, 1915, May 14, 1916, and November 14, 1916, amounting to $2,640 was paid as it became due. No further payment of principal or interest has been made.

"April 20, 1917, the plaintiff (who previously had become a stockholder of the railway company and of the produce company by purchase from the defendants Ewald and Begole), bought the mortgage from the lumber company and received an assignment thereof and of the indebtedness secured thereby, in due form, which he placed on record.

"To secure an indebtedness of the plaintiff to one Leslie French, of Escanaba, the plaintiff, on April 27, 1917, assigned the mortgage to French.

"The mortgage provided that upon continuation for thirty days of any default in the payment of any in-

stallment of principal or interest, or of any taxes, the mortgagee would have the right to declare the entire amount secured by the mortgage and remaining unpaid, immediately due and payable. The installment of principal, amounting to $2,000, and the semiannual interest, amounting to $840, due May 14, 1917, was not paid. Upon the default running over 30 days, the plaintiff elected to and did declare the whole amount due and on June 29, 1917, he filed his bill to foreclose the mortgage, making Ewald, Begole, Bourke, Wood and their respective wives and the Garden Bay Railway Company, defendants. The produce company was not made a defendant.

"The mortgage provides that in case of foreclosure the material in the tracks might be taken up and sold as personal property on six days' notice, posted in three public places in Garden township, and the plaintiff prays for a decree, permitting disposition of the material in the tracks in that way and on that notice.

"The defendants Begole, Bourke, Wood and the Garden Bay Railway Company joined in an answer, admitting the allegations of the bill of complaint and that the plaintiff is entitled to the relief prayed for by him, and then, acting on the suggestion of the railway commission that application for leave to abandon be made to the courts, they allege that for want of repairs, the track is positively unsafe for the movement of trains; that the company is without equipment of any sort for the transportation of passengers or freight; that it has no money and is unable to borrow money for the making of repairs or purchase of equipment; that the forest product which comprised the major part of the traffic in the past, is practically gone and the future is without prospect; that the revenues of the road will not equal the cost of maintenance and operation; that it incurred debts in the operation of the road which it has been and is unable to pay and its creditors are threatening legal proceedings for the collection of their claims; that it is impossible to dispose of the property as a going concern and realize enough to pay the mortgage and its creditors; that the steel rails in the track is the only salable asset possessed by the company which, if sold with right in the purchaser to take up and remove the

same, will bring sufficient to pay off the mortgage and all creditors of the company. They pray for a decree authorizing the company to cease operating the road; to take up and sell the material in the track as personal property, to dispose of its other property and to dissolve the company.

"For the payment of the notes secured by the mortgage, the defendant Ewald, as well as the other members of the partnership, was personally liable and subject to a decree for any deficiency. The bill prayed in the event of a deficiency, that Ewald and his co-partners be decreed to pay the same, but, by the underwriting of the subpœna served on him, he was advised a personal decree against him was not sought. The plaintiff's explanation is that when Ewald sold his holdings in the railway and produce company, it was contemplated he would be relieved from liability upon the mortgage, while Ewald claims the underwriting of the subpœna was framed as indicated as an inducement to him not to oppose but to join with the others in their effort to dismantle and abandon the railroad. Be that as it may, Ewald filed a separate answer. From the date of the option, he managed the road until April 29, 1916, when, owing to friction which grew up between him and the other stockholders, he was deposed, and the defendant Begole was installed as manager.

"Ewald asserts that during his term as manager, the revenues of the road were ample to meet the cost of maintenance and operation and the installments of principal and interest of the mortgage as they matured and he insists, in his answer, that under an efficient management of the property in the future, the upkeep and operating expenses and the mortgage can be met out of the revenues of the road, and that the shrinkage of revenue of which the stockholders complain, is the result of the inefficiency of management. He prayed for the appointment of a receiver with power to borrow money sufficient to discharge the matured obligations of the company, and to put the road in shape to operate and to operate the same for the benefit of the public.

"The defendant French answered, setting up the assignment of the mortgage as security for the in-

debtedness of the plaintiff to him, and asking that, should a sale of the property be ordered and be made, the proceeds thereof be first applied in discharge of the plaintiff's indebtedness to him.

"The township and village of Garden and certain residents thereof, in behalf of themselves and all others similarly situated, and the attorney general on behalf of the people of the State, petitioned in due form for, and were granted, leave to intervene and answer.

"The Garden Bay interveners did not file an answer, but the matters alleged in their petition for leave to intervene was treated as if repeated in a formal answer. Among other things their petition alleges the granting by the township of the railroad franchise to certain of the stockholders of the lumber company on their representation the road would be operated during the franchise period of thirty years; that its continued existence and operation is a public necessity; that the township of Garden is growing and thriving and will, if the operation of the road is resumed and continued, furnish it with business ample for its financial necessities and that the shortage of funds to meet the company's obligations is due to inefficient management and not to lack of profitable business.

"The answer of the attorney general alleges, on information and belief, that under proper management, the railroad should be a paying proposition, and that, by the expenditure of a reasonable amount, the road can be placed in a condition safe and suitable for the traffic it will be called upon to bear. He denies that under proper management the operation of the road would be likely to result in injury to passengers or employees; or that it will be necessary to take up and sell the material of the tracks as personal property in order to pay the amount due on the mortgage and avers that discontinuance of service over the road would result in a great injury to the people of the State and that such action is not a proper or lawful one.

"At the conclusion of the proofs, which were taken in open court, the plaintiff asked, and was granted, leave to amend his bill so as to make the produce company a defendant. The produce company immediately

appeared and adopted as its answer the answer of Begole, Bourke, Wood and the railway company, and entered into a stipulation that the case as to it might be disposed of on the proofs already introduced.

"The present indebtedness of the railway company to general creditors aggregates $8,600. Going to make up this total is a judgment for $1,750 arising out of the personal injury of an employee. Intervention on the part and behalf of the general creditors was applied for and granted, but excepting the owner of the judgment, no creditor has filed an answer or made any representation to the court respecting the amount or nature of his claim. The judgment creditor asks that his judgment be given priority over the plaintiff's mortgage as well as over all obligations of the railway.

"Assuming the judgment creditor would be entitled to priority over any mortgage placed on the property by the railway subsequent to the entry of his judgment he would not be entitled to priority over a mortgage which was on the property when the judgment was entered, much less over a mortgage on the property when the railway acquired it. But the plaintiff, as well as all other parties to the action having as they have advised the court, stipulated that the judgment be given priority over the mortgage, it will be done.

"The questions presented are:

"1. Whether the court has original or only appellate jurisdiction to entertain the application of the defendant railway to abandon the road.

"2. Whether the situation of the road and its future prospects justify abandonment, and,

"3. Assuming the road, if sold as a going concern, will not bring sufficient to pay the mortgage, whether the plaintiff is entitled to a decree permitting a sale of the track material separate from the other property with right in the purchaser to take up the tracks and thereby destroy the road."

This suit was begun on June 29, 1917, by plaintiff filing in the chancery court of Delta county a bill to foreclose the purchase price mortgage given by the

four partners to the lumber company in 1915 covering all the property they then purchased. These purchasing partners, Ewald, Begole, Bourke, Wood, their respective wives, and the Garden Bay Railway Co. were made defendants. The bill followed in general form an ordinary real estate mortgage foreclosure bill, reciting also and asking relief under a provision in the mortgage which authorizes the mortgagee in case of 30 days' default to enter the premises, take possession thereof and sell all the steel rails, ties, fish-plates, switches, etc., covered by the mortgage as personal property, on six days' notice duly posted in three or more designated public places. No attempt was made by plaintiff to pursue this summary method of chattel mortgage foreclosure, but apparently recognizing that the security was in its legal aspect primarily a real estate mortgage, because covering a railroad, plaintiff applied to the chancery court for a decree of foreclosure under the regular chancery practice in real estate mortgage foreclosures, thus conferring jurisdiction in that particular. But the appellants Begole, Bourke, Wood and the Garden Bay Railway Company by their answer especially ask the court to authorize abandonment of the railroad, and a decree that it may be dismantled and its steel sold as personal property.

We do not discover that counsel now question the decision of the trial court that it had in this proceeding jurisdiction to entertain the application of the defendant railway to abandon operating and dismantle its line under the peculiar circumstances of the case where, in the language of the trial court,—

"the question of abandonment is interlaced with other important questions which only a court of equity is authorized to entertain and which must or should be disposed of in order to settle the rights and equities of all persons concerned."

At the time the mortgage was given the Garden Bay

railroad was a private, unincorporated logging road held to no legal obligations as a common carrier and the mortgagee, or its assignee, was in case of default entitled by the terms of the mortgage to enforce collection on the indebtedness, even by dismantling the road if necessary to that end. The subsequent incorporation of the road by the partner mortgagors and its assumption of the obligation of a common carrier could not affect vested rights under the prior mortgage. Recognizing plaintiff was entitled to full protection of his rights and relief by decree of foreclosure sale under his bill, the trial court also found under the evidence that the public interest and needs required operation of the railroad to be continued; that under the facts shown the lands, dock and various buildings thereon, with water privilege, etc., which the partners had deeded to the Garden Produce Co. on the same day the rest of the property was deeded to the Garden Bay Railway Co. rightfully belonged and should have been deeded to the latter, which, if put in proper condition and properly managed could, and in the public interest should, be operated without loss.

On July 12, 1918, a lengthy decree was filed which, in brief and sufficient to indicate the subjects presented for review, orders that the produce company deed to the railway company the mortgaged realty standing in its name found held equitably belonging to the latter; that a receiver be appointed to take possession of the property described in the mortgage with power to borrow on receiver's certificate sufficient money to lease or purchase adequate equipment to operate the railroad as a common carrier and to pay the cost of operation for a specified time, said certificates to be a lien on the mortgaged property second only to plaintiff's claim under his mortgage, and that—

"all the property described in paragraph one (1) hereof and also all additions thereto of whatsoever name, nature or description, made by the receiver, shall be sold by or under the direction of said receiver at any time after the said thirtieth day of July, 1918, and not later than the thirtieth day of April, 1919, upon the notice usual in sales on foreclosure in chancery, at the front door of the court house in the city of Escanaba, in said county of Delta. At such sale all said railroad property shall be first offered as an entirety on condition and with the obligation on the purchaser to operate said property as a common carrier of passengers and freight, and shall be sold to the highest bidder, provided there shall be bid therefor with said operation obligation and condition attached, a sum sufficient to pay said Foster judgment and the amount now due on said mortgage with the interest and costs of suit. If, after waiting one hour, no bid for said property as an entirety with said operating condition and obligation attached, equal to said Foster judgment and the amount now due on said mortgage, with interest and costs of suit, shall be received, then the said receiver shall immediately offer said property separately as follows:

"1st. All rails, fish-plates, switches, bolts, spikes, railroad ties, tools, handcars, and all other removable improvements, materials, and equipment used for railroad purposes and in connection with the operation of the railroad of the Garden Bay Railway Company, owned by it or acquired by the receiver, as one parcel, with the right in the purchaser or purchasers, to take up and remove from the roadbed of the said railroad and dispose of as he or they see fit.

"2d. The entire right of way of the Garden Bay Railway Company, including all fencing, as one parcel.

"3d. All other real estate of said Garden Bay Railway Company and described in paragraph one (1) hereof, in separate parcels, all contiguous property being considered as one parcel.

"4th. All other personal property of said defendant railway company."

Out of the proceeds of such sale the expenses of making the same are to be first paid and then, consecu-

205—Mich.—2.

tively, the Foster personal injury judgment, mortgage indebtedness and costs of foreclosure suit, the receiver's certificates, *pro rata* the unsecured claims of creditors, and the balance, if any, to the treasurer of the Garden Bay Railway Co.

Of the status of parties to this suit, the appellant defendants are the Garden Bay Railway Co., the Garden Produce Co., Bourke, Begole, Wood, and their wives, with the Pittsburg Coal Co. and Minneapolis, St. Paul & Sault Ste. Marie Railway Co., creditors and intervening defendants. Defendants Begole and Ewald, who were formerly active partners and stockholders in the enterprise, had dropped out and their subsequent interest was largely reminiscent. Begole, who testified he had sold his stock because he "wanted to quit," named plaintiff Gasser and a Mr. Stephenson as the heaviest stockholders in the road and said, "Mr. Gasser has everything I had. He also acquired part of Mr. Ewald's stock." Ewald testified that he had sold his stock to Gasser and Stephenson, saying, "I realized from the sale of my stock, a quarter interest in the corporation, $710. After that transaction I severed my connection with Garden Bay Railway Company." He also admitted on cross-examination to an unfriendly feeling and replied to an inquiry in that connection, "I know of an attempt being made after I left the road to divert business from the road. I attempted myself." He was a strong and willing witness for the intervening defendants who opposed abandonment, as was Begole for the defendants who also "wanted to quit" and advocated dismantling the road. The plaintiff, Gasser, has not appealed and was not a witness in the case. Bourke, president of the road, testified that in November, 1916, he interviewed Mr. Lowe, then owner of the mortgage, who offered to discount it $2,000; that he so advised Mr. Gasser and "everybody interested at that time

with me." Gasser, who is a heavy stockholder in the appealing railway company, bought the mortgage and, after the contract made by the railroad in April, 1917, to sell its rails and other steel for $33 per ton delivered to the purchaser F. O. B. at Cook's siding fell through, filed this bill. He appears to be on safe ground in this litigation and has not personally appealed. Defendant French testified that he held an assignment of the mortgage as security for a loan and indicated his indifference as to results by replying, "I have other security." He also testified that the railway company did business with the Escanaba bank of which he was cashier while Ewald was acting as its manager, and its account was not very satisfactory owing to numerous overdrafts; that Ewald during that time stated the railroad did not pay and he used, or needed, the profits from the produce company to bolster it up. The people of the township of Garden and, in their behalf, the people of the State by the attorney general, as intervening defendants, contend against abandonment, claiming the road as an entirety should be sold to a purchaser obligated to operate it as a common carrier, or at least first so offered at public sale.

It is urged in behalf of the people of Garden township that because the township granted a franchise as described in the court's findings to the lumber company which constructed the road, the defendant railway company as assignee is thereby obligated to continue its operation during the franchise period. The conclusions of the trial court in rejecting this contention are supported in facts by the record and the reasons therefor well stated as follows:

"There is no language in the franchise from which an undertaking on the part of the grantees thereof to construct or to operate such railroad can be found expressly or by implication. In the construction of

the road, no right or privilege granted by the franchise was exercised. 'Except where it crosses certain highways, the road was not laid on or in any highway, street, alley, or public place of Garden township, and the highway crossings were not, it is claimed, made under the terms of the franchise but under arrangements between the lumber company and the township outside the franchise."

The Garden Bay Railway Co. having been incorporated under the laws of the State as a common carrier, secured permission from the railroad commission to issue stock and entered upon the operation of its line under the implied duty to the public to continue its operation as a public service corporation. It could not thereafter, in less than 18 months after its last hearing before the commission relative to its stock issue, arbitrarily abandon operations, permanently discontinue the assumed service and dismantle the road without the consent of the State through its constituted authority.

We need not review the many authorities cited or discuss the arguments presented by counsel on the varying phases of that subject, for the law is well recognized that the State can and generally will when possible enforce the continuous exercise of such granted corporate powers for public service and benefit, even though unprofitable or at a loss to the corporation, except under special circumstances where peculiarly equitable considerations justly warrant permitting abandonment.

Under those general principles the two important propositions involved and most seriously argued by counsel are whether the court in its decree of foreclosure erroneously ordered the railroad into the hands of a receiver to be repaired, equipped, operated and tested at the cost of the mortgaged property, and then to be first offered for sale on the condition that it be

continued a going concern as specified; and whether in that connection the court was warranted in requiring that the property standing in the name of the produce company should be deeded to the railroad company and included in the sale. These are largely questions of fact.

The evidence produced in behalf of the railway company and its appealing stockholders was conclusive that the road was not only unprofitable but had been running at a loss, had incurred pressing indebtedness for operating expenses which it could not meet and was without credit to secure further accommodations for necessities vital to continuing operation. Their evidence showed, mostly without dispute, that they had made various unsuccessful efforts to provide funds to finance the railway and put it in condition for further operation, had after repeated efforts been unable to secure financial assistance from the people of Garden township, the Minneapolis, St. Paul & Sault Ste. Marie Railway, with which the Garden Bay Railway connects, or to secure sufficient business for the railway to pay its operating expenses, which they attribute both to insufficient business tributary to the line to support it and failure of many of the business men and others in Garden township who at times required transportation to co-operate with and patronize the road; and to water transportation competition by a boat line from Garden Bay and nearby points.

In view of the proofs and claims of the appealing defendants in that particular the court correctly concluded that—

"To order the officers of the road to resume and continue operation thereof would be idle and futile. They have neither the means or disposition to go on with the property. Before there can be revenue from the road, money must be found to repair it and the necessary equipment purchased or rented and after

all that, to prevent eventual dismemberment of the road, the mortgage debt must be provided for."

Holding the road to be a public necessity, the court said in part:

—"by proper management the property should produce the revenue necessary to meet the cost of maintenance and operation, and repay the cost of the repairs and modest equipment presently required. That the road will produce revenue sufficient to pay also the incumbrance thereon is not so certain but that it will be able, eventually, to do so is within the realm of probability. * * * It is, perhaps, not probable that sufficient outside capital can be obtained to put the road on a revenue basis and to refund the mortgage, but the future prosperity of the inhabitants of Garden township depends in a large measure on the continuation of the road. They are alive to this condition, and are disposed to materially assist in financing the proposition."

The most tangible evidence we discover to sustain the theory that by proper management the property would produce revenue sufficient to repair and equip the road and pay its fixed cost of operation, interest, etc., is the testimony as to what revenue it produced during Ewald's management, in derogation of which is not only the testimony of French, an apparently equally credible and less partial witness, that Ewald had told him during that time that the road did not pay, but also the undisputed evidence of a marked increase in cost of operation and maintenance due to increase in wages of employees, cost of necessary material, fuel, etc.—coal alone steadily advancing from $3.25 per ton in the early period of operation to $8 in 1917—and a steady decrease in receipts both from freight and passengers. This decrease in revenue being attributable, as testified by appellant's witnesses, to increased use of automobiles for travel, and stock raising by the farmers which resulted in less hay

and other farm produce being shipped than formerly. The president of the road testified that he personally made all efforts possible to secure business for the road, and plaintiff's witness Harrison, receiver of the Wisconsin & Michigan Railroad and a practical railroad man of 30 years' experience, testified he had examined the road's statement of expenses and said:

"In my judgment this road cannot be operated at less expense than appears upon that statement. I would consider it had been operated very economically."

The date he was testifying is not given, but after stating items and cost he estimated the expense of running the road at $18,000 a year based "on the cost of wages and supplies today." F. W. Curtiss, division superintendent of the Soo Line, testified he had made an examination of this railroad and estimated "it would cost from $3,000 to $3,500 a mile to put the track in good shape. The engine and equipment which the Garden Bay Railway Co. used belonged to the Soo Line."

The testimony shows that Garden township was not settled as a result of the railroad nor the railroad built as a result of the settlement. Before the railroad was built farming communities had developed at certain available points in that region in connection with the lumbering, fishing and other industries located on the east shore of Big Bay de Noc, including the Fayette Furnace formerly operating in Fairbanks township, which constitutes the southern portion of the peninsula. The railroad was built by a lumbering company to serve that industry as a logging road to supply its mill at Garden Bay. Many of defendant's witnesses had lived in that section long before the road was built. Wesley Gray, an old resident and supervisor of Garden township for a number of years,

testified that the voting population of the township
had decreased, but was of opinion that the rural popu-
lation had neither increased nor decreased in the past
ten years. The adjoining township of Fairbanks,
claimed to be tributary to this railroad, was shown
to have approximately 14,000 acres in farms, while
Garden township had about 9,000 acres under culti-
vation. There are estimated to be 150 farmers living
within 8 miles of the road. The farming districts do
not lie along the railroad, except for a short distance
north of Garden Bay, variously stated at from 1½ to
4 miles, beyond which it runs through an unsettled
section consisting of cut-over land, swamp and sand
plains.

Touching the prosperous condition, resources and
bright prospects of future business development and
demand for railroad facilities in that peninsula, it
must be admitted as pointed out that the optimistic
claims made before the railroad commission when the
Garden Bay Railway Co. was incorporated and per-
mission asked to issue stock and prophetic showing
here made by the interveners protesting against aban-
donment, harmonize in marked particulars, and if
realized, or probable of realization, would be persua-
sive of the public necessity contended for; but the
established facts are convincing that the one is a re-
gretful memory and the other largely a hopeful an-
ticipation.

We agree with the trial court that the situation pre-
sented and duties assumed by the defendant railway
under its incorporation entitle the citizens of Garden
township, or others interested, to an opportunity to
purchase this property in its entirety for continuance
as a common carrier, if so disposed; and to that end
a receiver may properly be appointed to first take
charge of and conserve the property preparatory to
making public sale under the decree of foreclosure in

manner directed therein, but we do not think the equities of this case or public interest demand that the limited assets of this small railway should be absorbed or incumbered by receiver's certificates issued to repair, equip for operation and operate the line on the speculative hazard of the receiver being able to secure business sufficient to put it on a sustaining basis and facilitate a possible conditional sale, as proposed.  The restoration and operation of railroads by courts through a receiver is at best a doubtful industry, though sometimes imperative under pressing public necessity.  In *Central Bank & Trust Co.* v. *Cleveland,* 252 Fed. 530, where conditions somewhat analogous to those arising here are discussed, it was held:

"Where a small branch railway has for some years been running at a loss, and has been unable to pay indebtedness, residents who are neither stockholders nor creditors, cannot require continued operation of such railroad."

While the people of Garden township may not be legally or equitably entitled to require that operation of this road at a loss be continued, the court may at least for preservation of that public function give them opportunity to bid for the same at the foreclosure sale on such condition, protecting in that connection the mortgagee and creditors for fuel and rental of rolling stock furnished as a favor to keep the road in operation, recognized as especially equitable claims, before authorizing the road to be dismantled and abandoned.

Of the contention that the decree is erroneous because it requires the property standing in the name of the produce company to be included in the offer of conditional sale of the entire assets of the railway company, we think it within the power of the chancery court under the conditions here shown to so decree, whether it be put upon the ground of construct-

ive but unintentional fraud, in the light of subsequent developments, or of mutual mistake. The four purchasing partners bought all this property as an entirety and so mortgaged it. For some time thereafter they held and operated it together as an entirety. When for convenience of operation and to facilitate getting business for the road, or for other reasons satisfactory to them, they formed themselves into two corporations and deeded the property to them as stated, each yet held an equal interest in the assets and business as before. It was yet to them individually and as a practical proposition all one transaction and one enterprise conducted and jointly operated for all practical purposes as previously, the produce company being in effect an instrumentality of the railroad. The deeds to the two corporations were made before they had been incorporated, when delivered does not appear. They were not recorded when hearing before the railroad commission was had in behalf of the railway company and permission granted to issue stock, under a mistaken assumption, as the trial court found, that all this property of the four partners, bought, owned and operated together by the partnership as an entity was included in their articles of association for the railway incorporation. In reviewing that phase of the case the trial court deprecated any intended implication that in the course then pursued the partners sensed or sought any undue advantage to themselves, and said:

"The situation now confronting both companies was not contemplated by anyone when the conveyances were made. * * * The deeds which were made before either company was organized and before the attitude of the railroad commission became known, were, no doubt, inadvertently put on record without correction. The produce company being considered and being in fact a subsidiary or instrumentality of the railroad, and the property in the name of the for-

mer company being in constant use in furtherance of 'the business of the railroad and both companies having common stockholders, directors and officers, it would be quite natural for them to regard a formal correction of the deeds unnecessary as a practical matter."

With these conclusions we agree. In such a case equity may and should look to the substance rather than legal forms, but in adopting the forms by and through which these former partnership owners of the property continued operations they, unwittingly perhaps, burdened the artificial personality of their creation with a public duty they were not at liberty to ignore. We find no occasion to disturb the decision of the trial court that the equitable considerations involved in connection with that assumed public duty require all the property covered by the mortgage to be first offered together for sale on conditions imposed for continued operation of the road, but are of the opinion that the upset price imposed for the conditional offer of all the property should include the proven indebtedness to the intervening creditors for fuel and rent of rolling stock used in the operation of the defendant railway, excluding the item for the engine damaged by fire.

Modified as indicated the decree will stand affirmed, with the case remanded to the trial court for further appropriate proceedings in harmony with this opinion, without costs to either party.

BIRD, C. J., and OSTRANDER, MOORE, BROOKE, FELLOWS, STONE, and KUHN, JJ., concurred.