Marshall, C. J.
This is a review of the final order of the Public Utilities Commission, made after all parties were fully heard, which order contained the findings that the track had been operated for more than five years, that service upon the branch line between Columbus and Orient had been maintained at an actual financial loss, and that further maintenance of the service under such conditions might impair the credit of the applicant and imperil the maintenance of service upon the whole of applicant’s system. The major question in this case is whether the franchises hereinbefore referred to, and none of which has yet expired, constitute binding contracts, and whether the order of the Public Utilities Commission authorizing the discontinuance of service constitutes an impairment of the obligations of those contracts. Many legal questions have been ably argued, but it will be found that they are each and all subordinated to the major question, the effect of the franchises, and whether the stipulations in the franchises relating to the tenure of the ordinances and franchises create contractual obligations to continue the service to the end of the franchise periods, respectively; and, if so, whether those contracts are of such nature that an order for abandonment would amount to an impairment of their obligations.
Underlying the legal questions will be found certain questions of fact, upon which evidence has been *448 submitted to the commission, and concerning which findings of fact have been made, as already stated, and we have examined the record to ascertain whether there is evidence to support those findings, and we are of the opinion that there is abundant evidence upon which such findings can be predicated. It is not the province nor the purpose of this court to weigh that evidence; but it may properly be stated that there does not seem to be any contradiction, that all testimony concerning revenues and costs of operation stands wholly uncontradicted, and that therefore the commission could not reasonably have reached any conclusion other than the one in fact reached, to the effect that for the period of more than five years preceding the application this branch line was conducted at a financial loss, and that the financial condition of the entire system is such that it will not stand the strain of the burden of this and other branch lines. It appears that the entire system is in the hands of a receiver appointed by the federal court on the ground of insolvency, in proceedings to foreclose a mortgage.
It should be stated at the outset that public interests should be properly conserved, and that the rights of persons desiring passenger and freight transportation between Columbus and Orient, and intermediate points,- are entitled to serious consideration. If this short line were owned and operated by a company which owned and operated no other transportation lines, the problem would be somewhat less complex. The situation is, however, complicated by the fact that this line is owned and operated as a part of an interstate system of interurban railways, that it is a branch which does not form a *449 connecting link, and that its discontinuance would not inconvenience the general public, or its continued operation benefit any part of the public, except those desiring transportation over such branch. If the main line were profitable, so. that a loss by operation of the branch could be absorbed without imperiling the continued service to the larger public, the problem would be rendered less complex, though even then it is doubtful whether the people who are served by the main line should contribute toward the maintenance of an unprofitable branch. The fact is that the entire system is insolvent, and its affairs are being administered by a receiver appointed by the federal court in a proceeding to foreclose a mortgage, and it is claimed, not only that the main system cannot bear the losses of the branch, but also that it is unable to bear its own financial burdens, which claims are sustained by the fact of the insolvency proceedings.
This court has so often declared that the grant of a franchise by any subdivision of the state and its acceptance by a utility constitute a contract that that proposition may be considered finally settled. The same proposition has been often declared by the Supreme Court of the United States and the courts of nearly every state in the Union. A recent decision of the Supreme Court of the United States, Southern Iowa Electric Co. v. City of Chariton, 255 U. S., 539, 41 Sup. Ct., 400, 65 L. Ed., 764, reaffirms the doctrine and reviews a number of the more important former decisions of that court. It may therefore be considered as established that franchises which have been accepted and utilized have the character and status of contracts, and that the courts will recognize and *450 enforce the binding obligations of those contracts. In connection with this established principle, however, it must be kept in mind that all applicable statutory provisions are read into such contracts, including all statutes existing at the time the contracts are executed and all statutes thereafter executed pursuant to a lawful exercise of the police power. All such contracts in their inception are subject to the exercise of the police power of the state. Such contracts being at all times subject to public regulatory •authority, the reasonable and lawful exercise of such authority in the interest of the public welfare, though it might do violence to some of their express terms, would not amount to an impairment of their obligations.
The state of Ohio has conferred the administration of certain phases of this sovereign power upon the Public Utilities Commission, and this legislative authority has found expression in Sections 504-2 and 504-3, General Code, applying to railroad companies, now known as the Miller Act, but formerly known as the Gillmore Act. It is one of the prime essentials of the principles of public policy that freedom of contract and private dealing may be restricted by law for. the good of the community. It is a corollary to this proposition that all contracts when made are subject to the paramount rights of the public and that all contracts whose subject-matter involves the public welfare will have read into them with the same force and effect as if expressed in clear and definite terms all public regulations then existing or thereafter to be enacted which tend to the promotion of the health, order, convenience, and comfort *451 of the people and the prevention and punishment of injuries and offenses to the public.
This proceeding having been entertained by the commission under the authority of the Miller Act, there is involved an inquiry into the constitutionality of that act. Although the Gillmore Act was enacted March 21, 1917 (107 Ohio Laws, p. 525), and the. Miller amendment thereto April 15, 1919 (108 Ohio Laws, p. 372), and although the commission has made many orders pursuant to the authority of their provisions, some of which have been reviewed by this court, the question of the constitutionality of the act has not yet been clearly and finally disposed of. In Village of Northfield v. Public Utilities Commission, 100 Ohio St., 424, 126 N. E., 311, this court approved an order of the commission, but there was no discussion of the constitutionality of the law. In Village of St. Clairsville v. Public Utilities Commission, 102 Ohio St., 574, 132 N. E., 151, the same thing occurred. In East Ohio Gas Co. v. City of Cleveland, 106 Ohio St., 489, 140 N. E., 410, this court declared in a decision which was not unanimous that the Miller Act should not be given application to an existing contract. In that case, however, this court was not reviewing an order made by the Public Utilities Commission. In the instant case there is a contract in full operation and the commission has made an order permitting the utility to discontinue the service. Counsel have raised the question of the validity of the Miller Act and the question of its constitutionality cannot therefore be avoided. The authority for this legislation rests upon the police power of the state. The police power is *452 inherent, in sovereignty. It is not brought into existence by the Legislature. All legislative action upon subjects where the police power is involved is merely a recognition of a power already existing. Legislation in furtherance of the police power is only limited by the public welfare and the inhibition of the people’s Constitution. The Miller Act did not create the right of the sovereign state to stand guard over the abandonment or withdrawal of utility service. It merely regulated the mode of its exercise. The police power is not exclusively within the legislative branch of the government. Courts may make orders involving its exercise, and it may also be promulgated by executive authority within the limitations of the public welfare and due process. When declared by legislation, it is subject to the same limitations, and the judicial branch becomes the arbiter of such limitations. The commission has neither executive nor judicial power and it can exercise only the administrative power conferred by legislation. Whatever power the Legislature had could be conferred upon the Public Utilities Commission, and the Miller Act is the expression of that power.
The courts of many of the states-, and the federal courts, have repeatedly exercised the right to order the abandonment of railway service and this fact is so well known that it is unnecessary to cite any of those cases. We will only refer to a comparatively recent decision of this court. Gress v. Village of Ft. Loramie, 100 Ohio St., 35, 125 N. E., 112, 8 A. L. R., 242. That case was decided by this court several years after the enactment of the GHllmore Act, although the occurrences antedated that act. No reference was made to the act in the decision of *453 this court, but, although there was a public franchise which had not expired, this court authorized the discontinuance of interurban railroad service between the villages of Minster and Ft. Loramie. That case becomes a very potent authority, because it will not be contended that the courts can make orders for discontinuance of utility service, in the exercise of the police power, and at the same time denied that the legislative branch of the government can legislate to the same effect. The right to authorize the abandonment of utility service is in principle no different from the right to regulate such service. The right of regulation has never been doubted since the case of Munn v. Illinois, 94 U. S., 113, 24 L. Ed., 77. The exercise of the power of regulation in the state of Ohio, and in every other state of the Union, through public commissions, has been so universal, and covers so many phases of the subject of utility service, that it must be admitted that the exercise of the police power has been carried to much greater lengths than the mere control of continued operation or abandonment.
In the instant case it is not contended that the Miller Act is wholly invalid, but it is only contended that it is invalid in so far as it applies to existing contracts. The police power would lose very much of its potentiality if its operation could be defeated by contracts whose continued operation would be detrimental to the public welfare. As before stated, the courts have not hesitated to give relief in such cases, and the courts cannot reasonably deny to the legislative branch as full exercise of the police power as the courts have themselves exercised. If the exercise of the police power were to be confined *454 to a single branch of our government, it would be difficult to justify that single authority in the judicial branch. Surely a public commission is better equipped to make inquiry into the necessity and proper extent of public regulation. The inquiry must in many cases be purely ex parfe, and a commission is equipped, not only for the expeditious dispatch of business and with facilities for making searching inquiry, but also has power to employ technical experts and to keep on file for ready reference information concerning all public service companies operating within the state. Without further elaborating upon these features, it is sufficient to say that commissions occupy a field which courts were never designed to fill.
We must constantly bear in mind, in the consideration of the instant case, that the commission found, not only that the branch itself was being operated at a loss, but that the losses of the branch were so great that the weakened financial condition of the entire system could not sustain the additional burdens of the losses of its branches. Further light is thrown upon the attitude of this court in the case of Coe v. C., P. & I. Rd. Co., 10 Ohio St., 372, at page 381 (75 Am. Dec., 518), which we quote:
“If we are at liberty to suggest, on what the Legislature very probably relied for the continued operation of a railroad once constructed, we should say it was the interest of its owners. If it can be operated profitably, the interest of those concerned will rarely, if ever, fail to keep it in operation, so as to subserve the public use. If it cannot, we know of no mode by which the state can compel those by whom it was constructed to operate it at a loss; and *455 certainly there is no mode provided by which it can be operated at the expense and risk of the state.”
On the theory that the rights of the public rise above the rights of individuals, and that the rights of the larger public rise above the rights of smaller communities, we have reached the conclusion that the Miller Act gives valid authority to the commission to enter an order in this case.
There is another feature of this case which challenges earnest attention. This railway system is in the custody of the federal court, where a receiver was appointed in insolvency proceedings to foreclose a mortgage. The federal court considered an application for the discontinuance of the operation of this branch line and granted the order. It is true that in the same order the receiver was instructed to make application before the Utilities Commission for approval. This court has no means of knowing what further order the federal court would have made if the commission had denied the application of the receiver. We are, however, pointed to a large number of decisions of the federal courts, where receivers have been authorized to abrogate contracts made by railroad companies, and an examination of those authorities discloses that the obligations of existing contracts were authorized to be disregarded by receivers. We will not discuss or even cite all of those authorities, but will merely refer to some of the cases where authority has been given to discontinue operation because a continuance of operation would bring about the absolute exhaustion of assets.
In the case of State of South Carolina v. Jack, 145 Fed., 281, 76 C. C. A., 165, the Court of Appeals per *456 mitted the abandonment of a railroad, it being made to appear after experiments covering a period of four years that it was operated at a steady loss, and could not be sold for more than the cost of the rails. It was there stated that the owner was not “to be compelled either to operate the road at a ruinous loss or to walk away and abandon even the iron rails.”
In Gilchrist v. Waycross St. & Suburban Ry. Co. (D. C.), 246 Fed., 952, the court held that an insolvent street railroad company, in the hands of a-receiver under mortgage ' foreclosure proceedings, would not be permitted to continue operations at a loss, and that “to hold otherwise is to say that a mortgage creditor of an insolvent street railway company could never realize on his security by a sale of it, if the circumstances are such that the railroad cannot be operated except at a loss and the purchaser be compelled to operate the same.”
In the case of Central Bank & Trust Corporation v. Cleveland, 252 Fed., 530, 164 C. C. A., 446, the Court of Appeals declared that “where a small branch railway has for some years been running at a loss, and has been unable to pay indebtedness, residents, who are neither stockholders nor creditors, cannot require continued operation of such railroad.” .
After commenting at length upon the legal principles governing such matters, the court stated (252 Fed., at page 534, 164 C. C. A., at page 450):
“If it should be found that it cannot be operated, except at a loss, it would be open to the public, if it be authorized as a public measure, to condemn the property and take it for public'purposes at its as *457 certained value; but it cannot take it by the method of requiring its operation to the absolute exhaustion of the assets, and in that way effect the taking of private property for public purposes without compensation. There has been no case in which such a doctrine has been announced.”
Further comment of the court (252 Fed. at page 534, 164 C. C. A. at page 450) shows that that case was parallel in many respects to the instant case:
“In the first place, it is a small branch railroad, and it is not the public, as a general whole, which is affected, but only the limited number of individuals who are connected with the neighborhood of a small branch railroad. Next, the facts show that it is unreasonable to expect this railroad to be operated, so as to pay its costs of operation, except as a speculative hope.”
Further commenting upon the relation of the residents of a neighborhood to the enterprise, the court made the following statement:
“If the residents along the railway, or the public generally, desire that the railroad should be oper ated for their benefit, they can do so by supplying the income for that purpose, without making it a prior charge upon the property. The operation of the property otherwise than by the creation of a prior lien in the issue of receivers’ certificates would not appear to be practicable under the circumstances in this case. It would seem that the judge below should direct that the test of whether or not its operation would be successful, in the sense of procuring enough to pay for the expense of operation, should be at the charge and at the expense of the persons to be benefited and who insist upon that operation.”
*458 The Court of Appeals of the Sixth Federal Circuit, in the case of Baker v. Central Trust Co. of N. Y., 235 Fed., 17, 148 C. C. A., 511, had under consideration a receivership case which involved the question whether a traffic agreement between the insolvent railroad and another railroad, then in full force and effect, but which was unprofitable to the receiver, might be repudiated by him. In drawing the distinction between the obligations of receivers and the obligations of a company in full life and carrying on business, the court said (235 Fed., at page 25, 148 C. C. A., 519):
“The mere fact that they were executory and continuing in their nature, and gave rights to the Terminal in the future earnings of the Wheeling and to the Terminal’s bondholders rights in those earnings as a fund to which they might look for the payment of their interest, does not alter the essential quality of the contracts, which involve only a personal promise by the Wheeling, for the breach of which an action for damages would lie, or for which a specific performance might be decreed, if the Wheeling were in full life and carrying on its business, if that equitable remedy gave more adequate relief than would damages at law.”
In the light of the foregoing decisions of the federal courts, and having in mind that this particular railroad is in the custody of the federal court, and that that court has already made an order authorizing the abandonment of this branch line, and the further fact that the commission has already heard the evidence, and has found that the public interest demands the abandonment of this branch line, this court may not lightly declare, even though it might *459 believe that this franchise constituted a valid contract, whose obligations might not be impaired, that the contract would nevertheless be binding upon a receiver appointed by the federal court, and this court should further hesitate to make any order which would interfere with the federal court issuing an order of sale of the mortgaged property free from the obligation to continue the operation of this branch line. Clearly this property is in custodia legis, and within the exclusive jurisdiction of the federal court, and this court may not properly make any order interfering with the possession of the official having the property in custody. Many cases might be cited in support of this principle, but the principle is so well settled that citation of authority is unnecessary.
There is still another phase of this case which is worthy of comment. It has been assumed that there are franchises which require the operation of this branch line for a period of years to come. We have carefully examined those franchises, copies of which are found in the record. In several of them we find a stipulation that cars shall be run over the entire line not less than four trips each way daily, without any definite stipulation that such service shall continue during the period of the franchise. In the Grove City franchise it is stated that cars shall run over said railroad “each and every day of each year.” The county franchise, which expires May Í, 1923, contains the following language:
“Said road during this grant shall be operated daily by the making of at least one round trip from each end thereof,” etc.
*460 This last franchise expires very shortly, but in any event one round trip each day would be of very little value to the community to be served. We are of the opinion that the franchises only obligate the carrier to give a certain character of service during such period as the branch line shall continue in operation, and that the language employed in those franchises may not properly be given the meaning that the service shall continue to the end of the period of each of those franchises respectively.
We have so far discussed the case upon authority, and have reached the inevitable conclusion that the order of the commission is both reasonable and lawful. It is proper, however, that there should be some discussion of this matter upon principle. Whatever might be said in favor of requiring private persons and corporations to fully perform their contracts, it is not so clear that utility companies should be held to the same strict liability. Public utilities are no longer on a speculative basis. By public regulation of rates and service they have been placed on a conservative basis, whereby they are required to adequately serve the communities through which they transport passengers and property, and to furnish such equipment and devices as to insure reasonable safety, and are held responsible both to passengers and to the public for want of care. Furthermore, they are only permitted to make such charges for product and service as will earn a reasonable rate upon the property used and useful in the service. In all private enterprises, where parties are not limited in earnings, nor circumscribed by rigid public regulations as to manner of performance, there is sound reason in holding such parties to full perform *461 anee, unless such, performance has been rendered impossible by circumstances which could not reasonably have been foreseen. In private contracts the possibility of large profits compensates the risk of loss, and neither courts of law nor courts of equity will relieve a party from a hard bargain.
Upon considerations of sound public policy it is recognized that the power and authority of the state, through its commission, are available to compel the utility to go far beyond the terms of the contract in providing facilities and equipment to render the service safe and adequate. If, for example, the original franchise for transportation service through a primitive community called for one car each way per hour, and the later demands of the rapidly increasing population should require 10 cars per hour, or if the franchise should not stipulate closed cars or heated cars during the winter season, public policy permits the state to make laws, ordinances, and regulations to supplement the contract without regard to the additional expense imposed upon the utility. All this is upon the theory of the public need and that the public through its increased patronage will adequately remunerate the increased expense of operation. Thus the rights of the public rise above the sanctity of contract rights, and the state becomes the arbiter of the true relation between the greater need and the increased cost.
Let it be supposed, for further illustration, that an adequate bus service should be established between Columbus and Orient, and that people traveling and transporting freight between those points should prefer such service and give practically all their patronage to the bus line: Would it be con *462 tended that a franchise obligation to maintain a schedule of rail transportation should nevertheless be enforced, and all for no better reason than that the franchise given many years previously had so stipulated? If an increased public need is a sufficient warrant for an expansion of service, then, conversely, a diminution of need will justify a contraction. When the public patronage of a utility decreases to a point where it can no longer maintain its efficiency and meet its operating expenses, it will be accepted as a strong indication that that utility is no longer needed to subserve the public welfare.
The facts and circumstances of this case present a peculiarly strong case for the application of these principles. A growing community, which doubtless traces a part of its development to the service of this company, has had rail service, reliable at all times and in all emergencies, and a majority of the public continue to patronize it, while a minority,- exercising the prerogative of personal liberty, give preference to the bus in fair weather. The merchants employ the convenience of truck service. The state department of public welfare operates its own trucks to and from Columbus, instead of utilizing the freight service of the traction company. All such competition is made possible by the improved public highway which parallels the rail line. The rail line is built and maintained by private capital, while -the highway is provided in part by taxes and in part by assessment against abutting owners. The record shows that the highway is rapidly wearing out, to which the operation of the bus line is doubtless contributing. The bus service may not long outlast the *463 smooth surface of the improved highway, but this prospect does not worry either the owners or the patrons of the busses, who evidently assume that the patient taxpayers will renew the highway as often as necessary. The state, county, city, and village officials freely grant franchises for bus operation, and the state welfare department operates its own trucks over the highway rather than pay the reasonable charges of the public carrier, and if any problem in economics is presented in this controversy it should be solved by the executive department of the government rather than the judicial.
A careful reading of this entire record leads to the conviction that this utility could continue to live and serve this community if it had its support and co-operation, and it is equally apparent that the community cannot support truck and bus service, operate privately owned autos, and still afford sufficient patronage to the rail line to justify its continued operation. It is a matter of astonishment that the village, city, county, and state executive officials, and hundreds of people in the vicinity of this line, should appeal to the courts to compel the continuance of an unremunerated service, when the conditions which make that service unremunerative are of their own choosing. The commission evidently sensed this economic problem, because the order of abandonment of May 9, 1922, was suspended until September 1, 1922, evidently for the purpose of probation, to determine whether the protestants were earnestly and sincerely desiring continued service and in proof of that desire would give more general patronage. Evidently this clear note of warning was unheeded, *464 because the operating deficiency for that period was about the same as formerly. It is indeed deplorable that this community shall lose the service of this utility. It is inevitable that the community will sustain a severe loss. It may be even yet that some plan of co-operation between the utility and the community may be made to save the situation; but the legal problems presented by this review must be resolved in favor of the commission, and its order will be affirmed.

Order affirmed.

Robinson, Jones, Matthias, Day and Allen, JJ., concur.
Wanamakek, J., not participating.