## STATE OF TEXAS v. EASTERN TEXAS R. CO. et al.

## EASTERN TEXAS R. CO. v. RAILROAD COMMISSION OF TEXAS et al.

(District Court, W. D. Texas, Austin Division. August 11, 1922.)

Nos. 323, 325.

1. **Railroads ⊕⟶214—Charter contract arises on construction of road.**

The charter contract of a railroad becomes complete on its construction and continued operation and maintenance pursuant to its articles of incorporation.

2. **Railroads ⊕⟶214—Charter contract does not prevent abandonment on failure of adequate patronage.**

The contract arising from incorporation of a company for 25 years to construct, maintain, and operate a railroad is, in view of Const. Amend. 14, subject to a proviso authorizing abandonment of service and dismantling of road on failure of adequate patronage, in the absence of statute giving the public any further right in the property.

3. **Railroads ⊕⟶214—Statute requiring operation ineffective on failure of patronage.**

Rev. St. Tex. 1911, art. 6676, requiring a railroad to continue operation from day to day, is not effective after adequate patronage ceases.

4. **Railroads ⊕⟶214—Highways only while going concerns.**

Const. Tex. art. 10, § 2, declaring railroads to be highways, has reference only to such as are going concerns, and not to one to which the public has ceased to give adequate patronage, resulting in abandonment.

5. **Railroads ⊕⟶214—Statutory inhibition against removal of main line limited to sold-out roads.**

Rev. St. Tex. 1911, art. 6625, in terms inhibiting the abandonment or removal of the main track of any railroad, in view of the title and emergency clause of the act supplying it, the fact of it being an amendatory act, and Const. Tex. art. 3, §§ 30, 35, inhibiting amendment of a bill to change its original purpose and requiring a bill to contain but one subject, to be expressed in its title, *held* limited to a sold-out railroad.

6. **Courts ⊕⟶366(1)—Limits on duty to follow interpretation of state statute by state court stated.**

Federal courts are not bound to follow interpretation of a state statute by the state court, where the interpretation is violative of the national Constitution, or the right involved accrued before such interpretation.

7. **Railroads ⊕⟶214—Not required to operate at a loss.**

A railroad company cannot be required to operate at a loss, and, there being neither adequate patronage nor prospect thereof, it may dismantle its line.

In Equity. Two suits, one by the State of Texas against the Eastern Texas Railroad Company and others, begun in the state court and removed to the federal court; the other by the Eastern Texas Railroad Company against the Railroad Commission of Texas and others. Decrees for Railroad Company.

In suit No. 323, by the State of Texas to enjoin the Eastern Texas Railroad Company from discontinuing operation and from abandoning and dismantling its road, the railroad company, by cross-action, seeks injunction against the state from interfering or preventing abandonment of service and dismantling. In suit No. 325, the Eastern Texas Railroad Company sues the Railroad Commission of Texas and others for injunction preventing interference with its intention to permanently abandon operation and to dismantle its road.

⊕⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

E. B. Perkins, of Dallas, Tex., E. J. Mantooth, of Lufkin, Tex., Daniel Upthegrove, of St. Louis, Mo., and W. B. Hamilton, of Dallas, Tex., for Eastern Texas R. Co.

The Attorney General of Texas, Walace Hawkins, Asst. Atty. Gen., and I. D. Fairchild and John Redditt, both of Lufkin, Tex., for the State of Texas, the Railroad Commission of Texas, and others.

WEST, District Judge. These two cases relate to identical issues of law and fact, and are considered together. The Eastern Texas Railroad Company, called "Railroad," on June 3, 1920, applied to the Interstate Commerce Commission for authority to abandon operation and to dismantle and remove its road. The state of Texas thereupon, July 14, 1920, entered suit against Railroad in a state court to enjoin such action, and a temporary writ of injunction was issued. The case was removed to this court by Railroad, and was here numbered 323. On December 2, 1920, the Interstate Commerce Commission granted the certificate authorizing abandonment of Railroad. The temporary injunction theretofore issued by the state court was dissolved by this court.

Railroad, on December 20, 1920, brought its independent suit in equity, numbered 325 in this court, against the Railroad Commission of Texas and others, seeking to enjoin defendants from interfering with Railroad's right to abandon, dismantle, and salvage its property, as granted by the Interstate Commerce Commission. On April 29, 1921, a temporary writ issued as prayed for, and, awaiting result of appeal in No. 323, no further action was taken. The state appealed to the Supreme Court of the United States. The case was there docketed and numbered 298. That court issued its order April 21, 1921, suspending this court's order dissolving injunction issued by the state court, and required that the status quo be preserved.

The state of Texas and others, on September 10, 1921, brought suit in the United States District Court for the *Eastern* District of Texas, against the United States, Railroad, and others, to annul the Interstate Commerce Commission's order and certificate of abandonment. Railroad's motion to dismiss was granted September 21, 1921, and an appeal was taken and filed in the Supreme Court of the United States October 1, 1921, docketed and numbered 563. The two cases appealed, Nos. 298 (323) and 563, were considered together, and were both disposed of in the court's opinion of March 13, 1922 (258 U. S. 204, 42 Sup. Ct. 281, 66 L. Ed. ——), each case being reversed and remanded for further proceedings; the Supreme Court holding that the Commission's order and certificate of abandonment, issued under authority of section 402, pars. 18, 19, and 20, of the Transportation Act of 1920 (41 Stat. 456, 477), was adequate to sanction a discontinuance of Railroad's interstate and foreign business; that the road was entirely within a single state, owned and operated entirely by a corporation of that state, not a part of another line, its operation solely in intrastate commerce, and its abandonment or discontinuance was a question of local concern; that in these circumstances the Commission was without authority over its purely intrastate business. Whether, apart from the Commission's

certificate, the railroad is entitled to abandon its intrastate business, was not before the court.

Conforming to this opinion, Railroad, in case No. 325, on April 29, 1922, amended its bill and no longer relied on the Commission's certificate and order authorizing abandonment of its railroad properties in *intrastate* commerce. It declared that its property would be confiscated and taken without due process if denied the right to abandon operation in intrastate commerce, and to dismantle, salvage, sell, remove, and dispose of its property for the benefit of its stockholders, because contrary to the provisions of the Fourteenth Amendment to the Constitution of the United States, and also violative of the provisions of the Constitution of the state of Texas, and praying for injunction—a temporary writ being granted on the same day.

In case numbered 323 Railroad filed its amended answer, counterclaim, and cross-action May 13, 1922, setting up in substance matters alleged in the amended bill in that case, and seeking relief by injunction. The Railroad Commission of Texas and others, defendants, by supplemental answer, took issue, May 29, 1922, and filed a joint motion to (1) dissolve the temporary injunction theretofore therein issued, and (2) to dismiss the complainant's suit.

In case No. 323 the state of Texas asks that Railroad be enjoined from abandoning operation and dismantling its road, and be required to continue operation. Railroad by cross-action seeks injunction preventing interference with its right to abandon and dismantle. In No. 325 Railroad asks that the Railroad Commission of Texas, the Attorney General of Texas, and others, by injunction be prevented from interfering with Railroad abandoning and dismantling its road.

Railroad contends that it has the right to abandon operation of its road, and to dismantle it and dispose of its physical properties by sale or otherwise, to the best interest of its stockholders, because it is insolvent, and the revenues derived from operation are not sufficient to meet expenses and allow a fair return upon the investment, with no reasonable future prospect of such revenues, and says that to compel it to continue operation and to prevent it from dismantling would be to take its property without due process of law, contrary to the Fourteenth Amendment to the Constitution of the United States, and, likewise, contrary to article 1, § 17, of the Bill of Rights, and article 10 of the Constitution of the state of Texas. The state of Texas and its Railroad Commission contend that, by virtue of the charter contract entered into with the state and because of express provisions of its statutes, Railroad must maintain and operate its road in any event, and that the Fourteenth Amendment is without present application; also take issue with Railroad on the facts.

The Interstate Commerce Commission's certificate of public convenience and necessity authorized Railroad "to abandon the operation of all of its lines of railway now owned and operated by it, and to take up, dismantle or remove any part or all of the property of said company, and in any lawful manner to dispose of any or all parts of said property so taken up, dismantled, or removed, or as it is now situated." The Supreme Court, in State of Texas v. Railroad, supra, as noted,

holds that this certificate was sufficient to "sanction a discontinuance" of Railroad's interstate and foreign business only, and the questions (1) whether the state of Texas, operating through its Railroad Commission, and by force of its statutes and the charter contract, can compel reconstruction and operation of the road as an intrastate carrier, or (2) whether Railroad may "abandon and dismantle" as to intrastate commerce, are to be answered.

## Statement of Facts.

The Interstate Commerce Commission, considering the same issues in question here, found facts—admitted by the state's counsel to be true—as follows:

"The Eastern Texas extends from Lufkin, Tex., in a westerly direction 30.3 miles to Kennard, Tex., and has in addition to its main line track about 4 miles of switchyard and passing tracks. At Lufkin, its tracks connect with those of the St. Louis Southwestern Railway Company of Texas, hereinafter called the Cotton Belt, the Houston, East & West Texas Railroad, the Groveton, Lufkin & Northern Railway, the Texas Southeastern Railroad and the Angelina & Neches River Railroad. It has no other railroad connections. It maintains a joint agency with the Cotton Belt at Lufkin, has agency stations at Ratcliff, Tex., and Kennard, and has six sidetracks at other points, where carload freight may be received or delivered. It owns one combination passenger, mail, and express car but no other rolling stock. It rents one light locomotive from the Cotton Belt, and pays per diem under the code rules for foreign cars while on its line. The only regular service it maintains is one mixed freight and passenger train daily, except Sunday, between Lufkin and Kennard.

"The Eastern Texas was incorporated November 8, 1900, for 25 years, under the general railroad incorporation laws of Texas, to construct a railroad from Lufkin to Crockett, Tex. Its line was constructed to Kennard in 1901 and 1902, and has been continuously operated since, though it has not been extended to Crockett. The company was promoted and financed by individuals interested in the Texas-Louisiana Lumber Company, hereinafter called the Lumber Company, which is a subsidiary of the Central Coal & Coke Company of Kansas City, Mo. A substantial amount of applicant's right of way was donated to it by the owners of the land. It never received a land grant from the state, nor exercised the right of eminent domain. It was originally authorized to issue $150,000 capital stock, which amount was increased in 1902 to $1,000,000. Shares of stock with a par value of $454,500 but no bonds have been issued. On September 1, 1916, all outstanding stock of the Eastern Texas was acquired by the St. Louis Southwestern Railway Company, which, except for the directors' qualifying shares, still holds it. There is substantial identity between the officers of the Eastern Texas and the Southwestern.

"This line was constructed primarily to serve the Lumber Company, which then owned 116,000 acres of pine timber land near Kennard, and had constructed at Ratcliff what is said to have been one of the largest mills in the South for the production of lumber and forest products. Applicant built numerous tram roads through his timber to connect with its main line. On August 28, 1906, it sold these tram tracks, its current assets and rolling stock aggregating in book value $94,604.49 to the Lumber Company. This sale was made in contemplation of the transfer of the Eastern Texas stock to the Southwestern for bonds of that company stated to have been worth the par value of the stock and the fair value of the Eastern Texas as determined by the Railroad Commission of Texas.

"The Ratcliff mill ceased operation about 1917 and its tram tracks, machinery, and practically all of its buildings have since been moved to locations not on applicant's line."

And the state, in its brief, makes the further admissions that:

"The Cotton Belt Railroad, by reason of its ownership of the Eastern Texas stock, has allowed fair division of freight, and has extended to the Eastern Texas Railroad Company credit; interstate traffic arising on such road has been almost completely handled by the Cotton Belt; that the Cotton Belt Company is in a better position to furnish equipment, supervision,' labor, supplies, and all things necessary for the operation, maintenance, and support of the Eastern Texas short line; that if the road is abandoned, the nearest railroad stations for the communities served by the Eastern Texas Railroad will be Crockett on the International & Great Northern Railway, 17 miles from Kennard, and 20 miles from Ratcliff and Wells. Public highways in the country are not improved."

December 31, 1919, the Railroad Commission of Texas placed a valuation on this property of $458,048.64. There are no bonds or other indebtedness of the company. A credit of $42,228.06 on December 31, 1917, represented earnings from January 1, 1906. The mill at Ratcliff ceased operation in 1917. The road ceased operation April 30, 1921. After the loss of traffic from the mill, this credit was all absorbed, and up to April 30, 1921, an added loss of $11,743.75 is shown, or a total loss since January 1, 1918, of $53,972.01. The loss sustained under government operation for 26 months, was $85,544.98, making a total loss up to April 30, 1921, of $140,516.99. The road has no cash or credit. What its physical property may bring at sale as salvage is its only asset: That is estimated to be about $50,000, less the cost of dismantling. Though widely advertised and offered for sale at that figure, no bids were received.

Heavy expenditures on roadway and trestles will be necessary before operation can, with safety, be resumed. Two engineers, not in Railroad's employ, testified in June, 1922, that $250,000 would be required; the engineer for the state Railroad Commission, on January 17, 1921, reported that $120,000 would be sufficient. In July, 1920, the Interstate Commerce Commission's engineer estimated the amount at $146,-726. I find that on May 1, 1921, when operation ceased, a conservative and fair estimate would be $165,000, with an added expenditure of $20,-000 before June 1, 1922, a total of $185,000 to that date.

### Result of Operation.

The income statements, and in fact all of the tabulated data covering income from operation, the expenses, etc., made by the company, and like data during the period of federal control, and statements of tonnage and of ratios of revenues and expenses, state and interstate, from 1910 down to 1921, cover data filed by the company, as required by law, with the Railroad Commission of Texas and the Interstate Commerce Commission. These figures are not questioned and are taken as correct. The operating expenses from 1906 to 1917 averaged $52,577.63 per annum. The average operating revenue, per year, during the period was $66,711.38. There was no loss in operation for any year during that period, except $41,012.28 in 1908, and $1,798.38 in 1909. Trestles were being rebuilt during those years. Operating costs from 1918 to April, 1921, show heavy deficiencies—the year 1918, $20,128.46; 1919, $49,-362.64; January and February, 1920, $17,053.88; from March 1 to

December 31, 1920, $51,157.80; from January 1, 1921, to April 30, 1921, there was a loss of $12,177.02.

During the year the mill ceased working—1917—all reserves of manufactured forest products on hand were passed over the road; also the dismantled mill, machinery, and equipment moved over the road. This accounts for a heavy tonnage after the mill ceased operating. Mr. Green, the vice president of the railroad, basing future costs upon costs of operation shown in June, 1922, estimates the future total cost of operation as $100,713.55 per annum. As itemized the figures are:

| | |
|---|---:|
| Cost per month of operating, mixed trains | $1,664.23 |
| Cost per month of operating, section and other maintenance of way items | 2,592.69 |
| Cost per month of operating stations | 444.63 |
| Total | $4,701.55 |
| Total cost per annum | $56,418.56 |

"The above item, cost of operating mixed train, $1,664.23, only includes the wages of the train and engine men and the fuel. To the total cost per annum, $56,418.56 must be added, on the basis of business done in 1920; the hire of equipment, $8,350.17 per annum; taxes on 1920 basis, $3,952.41; joint facilities rents $120; maintenance of equipment, $5,092.37; 500 ties per annum would have to be renewed at a cost of $1.25 each in the track, which for the 30 miles would be a charge of $18,750 additional. This makes a total cost of operation of $92,683.51. The above items, however, do not include the entire cost of operation; but when all of the items are figured in it was the opinion of Col. Green that the total cost of operation would be $100,713.55."

This represents an increased cost for future operation over that of past operation up to 1917 of nearly 98 per cent. The state claims that this is due to inefficiency and uneconomic management. Railroad claims that increased cost of labor and material during the war period and subsequent thereto is responsible. The future average cost of operation per year will exceed by 60 per cent. the average per annum cost of operation for the first 17 years, being approximately $84,000. Future average annual estimated revenues from intrastate business is $20,000. The showing is a probable annual deficit for the future of $64,000.

The road was originally built to develop the 116,000 acres of pine lands owned and controlled by the Texas & Louisiana Lumber Company. From 1910 to 1921 80 per cent. of the traffic was lumber and forest products, practically all moving interstate from Ratcliff. From 1910 to 1917, inclusive, the average of interstate tonnage was 73 per cent., and 27 per cent. intrastate. During the same period the average of revenues for interstate tonnage was 66 per cent., and 34 per cent. intrastate. In 1920, 86 per cent. of tonnage was intrastate, and 14 per cent. interstate. In 1921, 91 per cent. intrastate, and 9 per cent. interstate. The same relative proportions obtained as to revenue. A deficit from March 1 to December, 1920, of $51,157.80, indicates that intrastate traffic alone is insufficient to pay the cost of operating the road. The four months ending April 30, 1921, show a deficit of $12,177.02.

As to future tonnage from products of the forest, state witnesses Gibson and Denton estimate that 230,000,000 feet of lumber are available when cut and milled into lumber for shipment, or approximately 46,000 carloads. Railroad's witnesses Irving, on direct, and Berry and Med-

ford, in rebuttal, qualified as men of special experience and of knowledge of the territory for a great many years. They are positive that all available tie timber had been cut by the Lumber Company, and the only other merchantable timber they found was in isolated, small tracts, held by the individual owners, and a few tracts on the lands of the Texas & Louisiana Lumber Company. The evidence further shows that the mill at Ratcliff at that time had been moved from this territory for lack of available raw material.

What of future agricultural developments? The testimony is conflicting. It is apparent, however, that the agricultural lands are confined to the low lands lying along the streams in that territory. The evidence shows that the cut-over pine lands are of the sandy and porous soil. Experiments in agriculture by those interested in the development of their lands have been unsuccessful. This portion of Texas was the first settled in the early years of the Republic, more than 80 years ago. Agriculture there has never been a success. Large acreages representing cut-over lands are held by their owners in solido, practically none being offered for sale. Practically no corn has ever been shipped out over the road. The highest movement of cotton in any one year—1914—was more than 6,000 bales. Since then there has been a marked decrease. The average annual movement from 1910 to April 30, 1921, was 2,200 bales. Revenue from cotton averaged $1 per bale.

In December, 1920, the Interstate Commerce Commission decided the same questions of fact that are before this court, on practically the same evidence and conditions, as late in point of time as 1920. The Commission found by its order and certificate of public convenience and necessity that the railroad should be abandoned. This conclusion was reached having in view the earnings and future prospects of the road, both as to state and interstate carriage. The evidence of conditions and occurrences since the Commission hearing down to cessation of operation—April 30, 1921—and as late as June, 1922, fully confirm the Commission's judgment.

Railroad, being no longer required to continue as an interstate carrier, must rely for future revenue solely on its intrastate business. Its value in 1919, so found by the state Railroad Commission, of $458,048.-64, had shrunk to a probable value as junk of $50,000 in 1921. Its total loss from 20 years' operation to April 30, 1921—the date of cessation—was approximately $145,000. Expenditures on deferred maintenance and replacements necessary to put the road in safe and efficient condition for future operation is fairly estimated at $185,000. Future average annual cost of operation would be approximately $84,000; future average annual revenue from intrastate business would be around about $20,000; the annual deficit $64,000. The charter expires November 1, 1925. The company is without money or credit, or means to resume or continue operation during the lifetime of its charter. These figures force the inevitable conclusion that the railroad company has reached the ultimate limits of any possible future activity, either physical or financial. It lies inert, practically bankrupt. In view of these facts, can the state compel resumption and continuance of operation of the railroad, and prevent dismantling and salvage?

## Law of the Case.

[1] The articles of incorporation were filed October 27, 1900, and conformed to the provisions of the general law. The object stated was for the purpose of "constructing, owning, maintaining, and operating" a railroad. The eight articles give (1) the name of the corporation; (2) the names of towns designated as termini; (3) the situs of its principal place of business; (4) the term of the charter as 25 years from November 1, 1900; (5) the amount of its capital stock; (6) the names of incorporators; (7) the names of its directors and officers; and (8) the number of shares of stock and the par value of each. Thus far there existed only "permission" from the state and an "intention" on the part of the company. The grant of charter rights and powers became fixed upon the construction of the railroad, and remained so during its continued maintenance and operation. The powers granted, the opportunity afforded to realize a reasonable profit on the one side, and the dedication of the company's properties, limited to use as a public highway for 25 years, were valuable considerations moving between the parties. Thus inchoate rights became vested. The charter powers granted and the laws governing the status thus created, and the mutual rights, obligations, and duties imposed, constituted a contract, so recognized since the Dartmouth College Case, 4 Wheat. 518, 4 L. Ed. 629, and as such protected by the Constitution of the United States. The state bases its right to require continued operation and prevent dismantling (1) upon breach of the contract; and (2) upon express statutory requirement.

## The Contract.

[2] The contract does not prohibit, in so many words, the removal of the railroad track; but the obligation assumed by the company to maintain and operate the road for 25 years, between certain designated points, is inconsistent with the right to remove. So long as the public uses the highway, it must be maintained at the location designated. The company must *continue* operation, unless some contingency arises vitally affecting performance. It dedicates certain of its real and personal properties to a particular public use—a public highway. No right, title, or interest in this property passes to the state or to the public, *except* the right of the public to use the property as a highway—a common carrier. As said in the Dartmouth College Case, supra:

"The property was private property. * * * Their [the trustees'] right to hold the charter, administer the funds, and visit and govern the college, was a franchise * * * solemnly granted to them. The use being public in no way diminishes their legal estate in the property, or their title to the franchise."

As in that case, Railroad retains physical possession and legal title to its properties, charged with the burden of their employment to the public use during the existence of the contract. In no other way is its legal estate diminished or burdened. The business of Railroad as common carrier must be conducted subject to the restrictions, regulations, and duties imposed by law. The state retains, in the interest of the public, the right to fix and to regulate the rates of carrying charges

which the public must pay. From the standpoint of Railroad, its ulti-
mate object is to realize profit. The state's chief concern is to provide
a highway of commerce for the public. The two ends can only be
reached by the *continuous use* of the property during the term of the
contract. It is the gist of the whole case.

Railroad's revenues are not sufficient either to pay current expenses,
or a fair return on the investment. To compel operation would be to
take its property without due process. This condition arises because
the public fails to use the highway; that is to say, the revenues derived
from that use are insufficient to produce the net returns allowed by the
law. The contract does not in terms provide or guarantee that the use
made will be sufficient to do this. It may be that neither party has
breached the contract; but the failure to use causes failure of revenue,
and failure of consideration, and stops the continuous use of the high-
way. The public's failure to use is, therefore, the prime cause of the
controversy. That revenues are inadequate and that property may be
taken without due process follow the *cause* as inevitable effect.

The case of State of Texas v. Travis County (1893) 85 Tex. 435, 21
S. W. 1029, a decision by the Supreme Court of Texas, is authority for
some of the propositions referred to. The Republic, later state, of Tex-
as in 1839 dedicated a certain block of ground in Austin, Tex., to be
used for the public purpose of a "courthouse" and "jail." The buildings
were erected, and were used for the purpose dedicated, by the county,
until 1876. The courthouse and jail were then abandoned, and new
buildings for those purposes were erected at another location, and oc-
cupied and used by the county ever since. The county, asserting title,
brought suit against tenants for rentals due under lease contract. The
state, through its Attorney General, intervened in trespass to try title.
The lower courts found against the state, which took its writ of error to
the Supreme Court. The only issue was one of title. The court holds
that the facts "show a dedication *of the use* of the block to the county
* * * so long as the county might elect to occupy it for such pur-
poses. The fee never passed out of the state." In the instant case the
public secured the right to *use* the railroad highway, but the company's
legal title never passed. Speaking to the doctrine contended for by
appellee, to the effect "that by the dedication public rights were acquired
in the use of the land, which could not be impaired or destroyed by the
action of either the county or state," the court declines to give it gen-
eral application in the case before it, and holds that the dedication must
be unqualified and clearly intended for general public uses, but, "in-
stead of being general or unqualified, * * * the privilege granted
was *to use* the land for a courthouse and jail." Therefore the use by
the public of Railroad's property, being for a limited and qualified pur-
pose—that is to say, a "highway"—the principle that the public had ac-
quired rights which could not be impaired or destroyed, as asserted by
the state in the present case, has no application. The court further says
(85 Tex. 441, 21 S. W. 1031):

"The state had pledged the land only for specified uses, and when they
were abandoned there rested upon it no obligation to devote the property to
purposes never consented to by it, by dedication nor otherwise, in favor of
either the county or purchasers of lots."

.The court cites in support of this proposition "Lewis on Em. Dom. § 596; Washb. on Easem. 707; Ang. on Highways, § 326; 5 Am. & Eng. Encyc. of Law, 419; 55 Pa. St. 350; 44 Ohio St. 406; 36 Barb. 136; 52 Conn. 256." The failure of the public to use the dedicated highway to such an extent as to afford fair compensation amounts practically to an abandonment. Being so, the dedicated *use* fails; the railroad ceases to be a public highway.

The Supreme Court of the United States has decided that the public cannot compel a railroad to run at a loss; that, apart from statute or express contract, people who have put their money into a railroad are not bound to go on with it at a loss, if there is no reasonable prospect of profitable operation in the future; that since the public may or may not use the highway, and the state retains the right to fix the compensation by regulating rates, the railroad is entitled to earn its expenses and a fair return upon its investment; that to deny such earnings and to compel performance of this duty would be to take its private property without due process of law, contrary to the Fourteenth Amendment to the Constitution, which provides that no state shall deprive any person of property without due process of law, or deny to any person the equal protection of the laws. Commission Cases, 116 U. S. 307, 6 Sup. Ct. 334, 388, 1191, 29 L. Ed. 636; C., M. & St. P. Ry. Co. v. Minnesota, 134 U. S. 418, 10 Sup. Ct. 702, 33 L. Ed. 970; Budd v. New York, 143 U. S. 517, 12 Sup. Ct. 468, 36 L. Ed. 247; Reagan v. Farmers' L. & T. Co., 154 U. S. 362, 14 Sup. Ct. 1047, 38 L. Ed. 1031; Smyth v. Ames, 169 U. S. 466, 18 Sup. Ct. 418, 42 L. Ed. 819; Northern Pacific R. R. Co. v. North Dakota, 236 U. S. 585, 33 Sup. Ct. 429, 59 L. Ed. 735, L. R. A. 1917F, 1148, Ann. Cas. 1916A, 1; Brooks-Scanlon Co. v. Railroad Commission of La., 251 U. S. 396, 40 Sup. Ct. 183, 64 L. Ed. 323; Bullock et al. v. Florida et al., 254 U. S. 513, 41 Sup. Ct. 193, 65 L. Ed. 380. In point of fact the state is not seriously maintaining the contrary to principles declared by these opinions.

Railroad having granted the public an interest in its use, it may withdraw its grant by discontinuing the use, when that use can only be kept up at a loss. Munn v. Illinois, 94 U. S. 113, 24 L. Ed. 77; Brooks-Scanlon Co. v. Railroad Commission, supra. Giving effect to this principle is to declare that, notwithstanding the obligation of the charter contract to construct, maintain, and operate the road as a common carrier between designated points for 25 years, Railroad had the right to withdraw its property from use by the public unless adequately compensated, because in violation of the Fourteenth Amendment; that is to say, the amendment controls, notwithstanding the obligation of the charter contract. The law reads into the contract a proviso, which says: "The railroad may terminate this contract, and withdraw its property from public use, unless compensated, or there is a reasonable future prospect thereof." The state has directed attention to no particular provision of the contract which requires continued operation and maintenance and prohibits removal in any event. The court finds none, and so holds. The contract fails to define the rights of the parties upon its termination. If the withdrawal from public use be permanent, as in this case, that constitutes rescission, or abandonment. The contract terminates.

283 F.—38

The property reverts to its owner, freed of any claim of right in the state, or the public, unless such a right is created by statute.

## The Statute.

To maintain its position the state also relies on title 115, articles 6676 and 6625, of the Revised Statutes (1911) of the state of Texas, and the provision in the Constitution of Texas (article 10, § 2) declaring railroads to be highways.

[3] Article 6676 requires that a railroad shall continue operation from day to day; the charter contract substantially covers this requirement. No authority is presented why this article stands in the way of the application of the Fourteenth Amendment under the facts in this case. This article and practically *all* of the regulatory enactments are effective *only* during the existence of the contract; that is to say, while the public is making use of the company's facilities to such an extent as will enable it to operate from day to day. The state does not maintain that "day to day operation" is required *after* the contract is terminated by failure of consideration, and consequent necessary and enforced lawful abandonment. Nor does the state contend that the article affords justification for burdening the properties with a use which is and can no longer be lawfully exercised by the public.

[4] The constitutional designation that all railroads of the state are highways can only have reference to railroads that are going concerns. A highway is no longer a highway when the public ceases to use it. The state's right to take private property under conditions that violate the fundamental paramount law must be founded upon something more substantial than mere declaration.

[5] Article 6625, and the interpretation given it by the Texas courts, are the main stays of the state's contentions. This article became effective March 29, 1889 (Acts 21st Leg. c. 24), prior to the grant of the charter in 1900. A copy follows:

Caption: "Railroads."

"Sec. 1. As to rights of purchasers of roadbeds, etc., sold for debt.
"Sec. 2. Jurisdiction over companies availing of the provisions of this law.
"Sec. 3. Emergency clause.

"Section 1. Be it enacted by the Legislature of the state of Texas: That chapter 11, tit. lxxxiv, of the Revised Civil Statutes of the state of Texas, be amended by adding thereto the following article:

"Article 4260a. That in case of any such sale heretofore or hereafter made of the roadbed, track, franchise, or chartered right of a railway company or any part thereof as mentioned in article 4260 above, the purchaser or purchasers thereof and their associates shall be entitled to form a corporation under chapter one of this title, for the purpose of acquiring, owning, maintaining, and operating the portion of the road so purchased as if such road or portion of the road were the road intended to be constructed by the corporation, and when such charter has been filed the said new corporation shall have all the powers and privileges conferred by the laws of this state upon chartered railroads, including the power to construct and extend: Provided, that notwithstanding such incorporation the portion of the road so purchased shall be subject to the same liabilities, claims, and demands in the hands of the new corporation as in the hands of the purchaser or purchasers of the sold out corporation: Provided, that by such purchase and organization no rights shall be acquired under any former charter or law in conflict with the provisions of the present Constitution in any respect, *nor*

*shall the main track of any railroad once constructed and operated be aban-
doned or removed.*

"Sec. 2. No railway company availing itself of any of the privileges herein
provided shall claim to be under the jurisdiction of the federal courts by
reason thereof, and any railway company which may avail itself of the
said privileges which shall claim to be subject to the jurisdiction of the
federal courts in pursuance of this act shall ipso facto forfeit its reorganiza-
tion and be remanded to the same condition as it was prior to said reorgani-
zation.

"Sec. 3. Whereas there is in existence no law which sufficiently provides
the manner in which a railroad company sold out under decree of the court
or otherwise may form a corporation for the purpose of acquiring, owning, and
extending such sold out property, and the lateness of the session, create an
emergency and imperative public necessity authorizing the suspension of the
constitutional rule requiring bills to be read on three several days, and that
this act shall take effect and be in force from and after its passage; there-
fore it is so enacted."

This act is supplementary to article 4260, which provided that, where
a railroad and its franchises were sold, the purchaser took the property
and charter rights, and had a right to operate the road. Article 4260a
was amended by the Act of September 1, 1910 (Acts 31st Leg. Fourth
Called Sess. c. 4), but the material provisions were unchanged. Article
4260a was made a part of title 84, Rev. Stat. Texas of 1879, p. 593, sub-
ject "Railroads," divided into 13 chapters, each with guiding subtitles.
Chapter 11, p. 612, subtitled "Collection of Debts from Railroad Cor-
porations," included this article, along with others, each given subtitle.
Article 4260a was carried into Rev. Stat. Texas of 1895, title 94, p.
874, same subject, same chapter, and incorporated as article 4550, and,
as amended September, 1910, was carried into Rev. Stat. Tex. of 1911,
title 115, "Railroads," p. 1374, same chapter 11, same subtitle, article
renumbered as 6625, subtitled "New Corporations in Case of Sale may
be formed, How." The general subject title 115, "Railroads," contains
19 chapters, and 349 articles. Briefing the chronology of the article
shows Revised Statutes 1879 incorporated in 1889 as article 4260a, in-
corporated into Revised Statutes 1895 as article 4550, and incorporated
into Rev. Stat. 1911 as article 6625. This article was considered by the
Supreme Court of Texas in State v. Enid R. R., 108 Tex. 239, 191 S.
W. 560, a case relied on by the state as authority prohibiting disman-
tling.

The act prohibiting the abandonment or removal of the main track of
any railroad was not intended to be general in character. This prohibi-
tion is clearly intended to be limited only in cases where a railroad has
been sold out under foreclosure. The Legislature had in mind the pur-
pose to require the purchasers of "sold-out" railroads to continue to
maintain and operate them by preventing abandonment or removal of
main tracks. The word "any" would infer a purpose to make the pro-
hibition affect *all* railroads. The caption of the act and its emergency
clause evidence a contrary intention. The accepted rules of construc-
tion and interpretation of statutes would give this act application only
in those instances where the railroads were sold and new corporations
were to succeed the old.

The Constitution of the state of Texas provides (article 3, § 30), "No
bill shall be so amended  *  *  *  as to change its original purpose,"

and in section 35, "No bill (except general appropriation bills)  *  *  *
shall contain more than one subject, which shall be expressed in its title.
But if any subject shall be embraced in an act, which shall not be ex-
pressed in the title, such act shall be void only as to so much thereof as
shall not be so expressed." Some of the objects of these sections are to
prevent embracing in an act, having a single purpose, irrelevant provi-
sions having other and different objects, thus to· conceal and disguise
the real purpose under a misleading and deceptive title; to prevent
bringing together into one bill diverse subjects to secure support of ad-
vocates of all, neither of which could succeed on its own merits; to rem-
edy the practice by which, through cunning management, clauses are
inserted in bills of which the title gave no intimation, thereby securing
passage of bills, members being misled and unaware of their real scope
and effect—in modern vernacular, putting in the "joker." These sec-
tions, in point of fact, are given a liberal construction, and in line with
an elementary canon of statutory construction, that the subject of an
act must conform to and be germane to its purpose.

The very first words in the act refer to the article 4260, which it sup-
plements, and its subject—the sale of a road and its properties. In the
revision of the laws in 1895, it was made a part of *chapter 11*, and given
its subtitle, "New Corporation, in Case of Sale," retaining its same title .
and place in the revision of 1911. If 'the subject and the purpose of this
act was to declare a rule of law that all railroads in the state could no
longer be abandoned or removed, it could find no proper place under
a title that had to do with the formation of new railroad corporations "in
case of sale." One or two of the chapter headings under the title 115,
"Railroads," would indicate where a law of general effect should be
placed; for instance, under head of chapter 10, which is subtitled "Re-
strictions upon, Duties and Liabilities of Railroad Corporations," or
chapter 19, headed "General Provisions." It seems, therefore, that to
give the prohibitory words a wide and general meaning would be to
say that the·subject of the act has a double significance, contrary to the
plain requirements of the Constitution, and not germane to its title.
Article 4260a has been the subject of comment and interpretation. The
first appears in an opinion by District Judge Key in the case of Texas
v. East Line & Red River Railroad Company, rendered February 8,
1891, 48 Am. & Eng. R. R. Cases, 660. That was a case where a rail-
road charter was forfeited and the property placed in the hands of a
receiver. The court, referring to this article of the statute, says:

"The Act of March 28, 1889 (now article 6625), providing for the sale of
railroads and authorizing purchasers to incorporate, declares 'nor shall the
main track of any railroad, once constructed and operated, be abandoned or
removed.' Whether this statute can be invoked against any one not a pur-
chaser at such sales, as referred to in the act, may not be clear."

In Wexler v. State, 241 S. W. 234, in the Galveston, Texas, Court
of Civil Appeals, April 13, 1922, in a case where an interurban railroad
had been "sold out," interpreting the article in question, then bearing
its new number 6625, the court in effect holds that the primary purpose
of the Legislature was to provide a means by which the purchaser of a
railroad organized under title 115 of the statute, and which had been

sold under a foreclosure decree, could obtain a new charter for the operation of such railroad.

In Enid Railroad v. State (Tex. Civ. App., December, 1915) 181 S. W. 498, it is held that:

"Article 6625, R. S., in reference to 'new corporations in case of sale,' provides for the formation of new corporations 'for the purpose of acquiring, owning, maintaining and operating "sold-out"' railroads."

Then follows an excerpt from the prohibition as to abandonment. The court states that this prohibition is declarative of the common law, and that the article is important only as declaring a general policy of the state in case of a "sold-out" railroad. The emergency clause, section 3 of the act (article 4260a), definitely declares that the emergency existed, because there is "no law which sufficiently provides the manner in which a railroad company sold out under decree of the court or otherwise may form a corporation for the purpose of acquiring, owning, and extending such sold out property." Considering the constitutional provisions, and the rule of statutory construction that the subject of the act must conform to and be germane to its purpose, the court, having also in mind the presumption that a law is constitutional, and giving a liberal construction to the statute, holds that the prohibitory provision against abandonment or removal by a railroad company applies only to the case of a "sold-out" corporation.

### The Enid Case Dictum.

The state's contention as to the general effect of the article is based wholly on the decision of the Supreme Court of the state of Texas in the case of Texas v. Enid, O. & W. R. R., 108 Tex. 239, 191 S. W. 560. That was a case where a railroad company had been constructed and operated, later abandoned, a receiver appointed, the property sold, and the purchasers forbidden to remove the tracks. The gist of the court's decision is contained in the following excerpt from the opinion (108 Tex. 245, 191 S. W. 562):

"When the old company accepted the charter, they impliedly consented to be bound by the provision of law to the effect that they would not move it. When plaintiffs in error purchased the road and its franchises, they became likewise obligated. We think they are bound by contract and by statute law not to move any portion of the main track, and that since they are attempting to do so they should be enjoined to desist therefrom. By the terms of article 6625, Vernon's Sayles' Civil Statutes, it is provided, in substance, that the 'main track' of any railroad, once constructed and operated, shall not be 'abandoned or moved.' We think the defendants in error should not be permitted to take up the rails and ties in violation of said statute."

This case had come from the Court of Civil Appeals by way of writ of error; that court holding that the track could be removed, and the road abandoned as such. Enid, O. & W. R. R. v. State, 181 S. W. 498. The Supreme Court in its opinion did not refer to the rights which the Enid Railroad might have under the provisions of the Constitution of the United States. The facts in the Enid Case show the railroad in that case to have been a "sold-out" railroad, and therefore was a case to which the terms of article 6625 had special application. The court did not intend to give the article any broader scope than the facts in the

particular case warranted. The Enid Case is not authority sustaining the state's position that the article has general application. The railroad is not being "sold out," in this case, or purchased under the provisions of the article. The court referred to no other statute when it stated that the defendants were bound by the statute law not to abandon or move the main track. It may not be relied upon as a decision of the highest court of the state upon a question of local law, and thus binding upon the national courts, because the effect of the decision must be limited to the facts and the law of that particular case. If the decision intends to extend the prohibition against abandonment or removal of *any* railroad, without limitation, thus giving it general effect, the holding would be unnecessary to the decision of that particular case, and consequently dictum, and not an authority upon that point.

Unless definitely and unmistakably fixed by statute, or by the terms of the contract itself, the state could not arbitrarily prevent the sale by the carrier of any of its property where it was no longer reasonably probable that the state, or the public, would use it for the purpose for which it was dedicated under the terms of the charter. As previously stated, the only right, title, and interest which the state has in the property is the right to use it in the interest of the public. If circumstances occur which render it incapable of being so used, then the state and the public cease longer to have any further interest therein. To lay hands on the property under these circumstances to prevent its dismantling or removal by its owners, after abandonment, would effectually operate as a taking without due process of law.

[6] The extent to which federal courts are bound by the interpretation of state statutes by state courts is shown in cases where conflicts arise with the national Constitution, and where rights accrued before adverse construction by the state courts. The Enid Case is in conflict with the Constitution. In Missouri Pacific Railway v. Nebraska, 164 U. S. 403, 17 Sup. Ct. 130, 41 L. Ed. 489, the court says:

"The taking by a state of the private property of one person or corporation, without the owner's consent, * * * is not due process of law * * *" —violative of the Fourteenth Amendment.

Railroad was chartered in November, 1900. The Enid Case was decided February 7, 1917. Federal courts are not bound to follow the decision of the state court, where rights have accrued under decisions, or for lack of decisions of the state tribunals. The federal courts having co-ordinate jurisdiction may adopt their own interpretation of the laws, although the state courts may stand on a different interpretation after rights have accrued. Burgess v. Seligman, 107 U. S. 20, 2 Sup. Ct. 10, 27 L. Ed. 359; Kuhn v. Fairmount Coal Co., 215 U. S. 349, 30 Sup. Ct. 140, 54 L. Ed. 228.

What has been said concerning article 6625, and as to whether it should be given general or special application, and as to the effect of the decision in the Enid Case, forces the conclusion that the article should not be given general, but special and limited, application; further, that the decision of the Supreme Court in the Enid Case, for the reasons stated and the facts found to exist, is not authority binding upon the federal tribunals, or upon the Eastern Texas Railroad.

Abandonment.

[7] The cases authorizing railroads to suspend or abandon operation under given circumstances are legion. Some of them have been referred to. The leading case upon the question as to whether or not a railroad may permanently discontinue its functions as a common carrier, or may wholly abandon its services to the public, dismantle, sell, and salvage its property, is the case of Jack v. Williams (C. C.) 113 Fed. 823, decided by Judge Simonton, of the District of South Carolina, on February 1, 1902. The facts found by the court, as to ultimate conclusions, are the same as in this case. It appeared in that case that, to compel the railroad's operation at a certain loss, or to keep it intact, unused, would be to deprive its owners of their property without compensation. Accordingly the receiver was ordered to dismantle the road and sell the material. As a presentment and discussion of all the then cases bearing on the issues in this case, and as the decision of a learned and eminent jurist, the entire opinion ought perhaps to be embodied here. The case is authority for the abandonment of a railroad and the dismantling and sale of its properties. The court cites it as such; also as cumulative authority upon some of the other vital issues in this case. The reasoning of the court is identical with the reasoning employed by the Supreme Court of the United States in the cases cited, supra, wherein the principle is maintained that a railroad could not be required to "operate" at a loss. If one's property is taken without due process in the instance of loss from operation, it is equally so taken in the instance where the effort is to restrain an owner from dismantling an abandoned property no longer being used, nor capable of being used, in the public service. In estimating the value of this case as authority, it is noted that the court's finding was affirmed by the Circuit Court of Appeals. 145 Fed. 281, 76 C. C. A. 165. The Circuit Court of Appeals refers to the obligation imposed upon the owners of a railroad to maintain it as a highway, but in view of the facts in that case, in affirming the action of the lower court, stated:

"The opinion of the late Judge Simonton in the court below carefully recites all the facts connected with the attempts to operate the road, he having appointed the first receiver and being familiar with its history, and it seems to us unnecessary to further add to his convincing statement of the ground upon which the cross-bill was dismissed."

Jack v. Williams has been cited with approval in other cases where the same principles of law are maintained; that a railroad could be abandoned and disposed of to the best interest of a mortgagee by sale (New York Trust Co. v. Portsmouth & Exeter Ry. [C. C.] 192 Fed. 728; State v. Old Colony Trust Co., 215 Fed. 307, 131 C. C. A. 581, L. R. A. 1915A, 549; Gilchrist v. Waycross Ry. [D. C.] 246 Fed. 952), and a number of decisions to the same effect from the appellate courts of the various states.

In this case certain individual defendants are joining the state of Texas, and its Railroad Commission, in the effort to require continued operation and to prevent dismantling or removal of the railroad. Their rights as parties appear to rest upon their general status as residents and members of the community, or country, theretofore served by Railroad.

Where private property is dedicated to the public, and the use limited to a particular purpose by the terms of the charter contract, all having an interest in the matter are charged with notice that the abandonment of a particular use by the public would terminate the charter contract and authorize withdrawal of the private property from the particular use, thus destroying any right the public may have had in the property. Whatever interest others had in the use of the property was acquired with the knowledge of, and subject to, the contingency which has arisen in this case. Texas v. Travis County, 85 Tex. 441, 21 S. W. 1029, supra; Jack v. Williams [C. C.] 113 Fed. 823, supra; the same case on appeal, 145 Fed. 281, 76 C. C. A. 165, supra; Central Bank & Trust Corporation v. Cleveland, 252 Fed. 530, 164 C. C. A. 446.

From the foregoing it results that the state of Texas in the suit numbered 323 should take nothing, and that the injunction issued by the state court should be dissolved, and further that the defendant, Railroad, should be authorized to abandon its railway as to intrastate as well as interstate traffic, and also to remove its ties, rails, and track, and dismantle all of its structures and property, and to dispose of them by sale or otherwise as it may be advised. It also results that the Eastern Texas Railroad Company, plaintiff in No. 325, is entitled to have the temporary restraining order, heretofore issued in this cause, against all of the defendants, made perpetual.

Final orders and decrees carrying into effect the conclusions of the court, as herein expressed, will be entered in due course.