BROWNWOOD NORTH & SOUTH RY. CO.
v. RAILROAD COMMISSION OF
TEXAS et al.

(District Court, W. D. Texas, Austin Division.
December 24, 1926.)

No. 356.

1. Railroads ⟜214—Interstate Commerce Commission cannot order abandonment of railroad engaged wholly in intrastate commerce.

Interstate Commerce Commission has no power or authority to issue an order for the abandonment of a railroad that is engaged wholly in intrastate commerce.

2. Railroads ⟜214—Railroad charter does not oblige company to operate at loss.

The charter of a railroad company does not obligate it to operate its railroad at a loss, nor is such obligation implied from the acceptance of its charter and operation under it.

3. Railroads ⟜214—If loss is reasonably certain, railroad may cease operations in absence of contract.

If it appears reasonably certain that future operation will be at a loss, a railroad, in the absence of a contract, may cease operations, dismantle its road, and realize its salvage value.

4. Constitutional law ⟜298(2)—To compel railroad to operate at a loss is to take property without due process (Const. Amend. 14).

For a state to compel a railroad to continue operation at a loss is to deprive it of its property without due process of law, in violation of Const. Amend. 14.

5. Railroads ⟜214—Railroad's acceptance of charter is not waiver of constitutional guaranties.

Charter of railroad and its acceptance is not a waiver of constitutional guaranties.

6. Railroads ⟜214—That others have made improvements in expectation of continued operation does not result in implied obligation of railroad to operate.

That others have made substantial improvements along railway, and in tributary territory in expectation of continued operation does not burden railroad with implied obligation to operate.

7. Railroads ⟜214—Individuals adversely affected by railroad's abandonment of operation have no cause of action for damages.

Railroad's abandonment of operation, with resulting damage to communities served, in itself gives no cause of action to individuals affected.

8. Railroads ⟜214—Evidence of railroad's operating expenses and future prospects held to entitle it to abandon operation.

Evidence showing operating losses of railroad and establishing with reasonable certainty that future revenues will not meet operating expenses, costs of replacements, and maintenance, and in addition yield a fair return on the investment, held to entitle railroad to abandon operation.

In Equity. The Brownwood North & South Railway Company sues the Railroad Commission of Texas, the Attorney General of Texas, and other defendants, shippers of freight over plaintiff's railroad, to enjoin them from preventing plaintiff abandoning the operation of its railroad from Brownwood, Tex., to May, Tex., and from enforcing the penalties prescribed by the laws of Texas against railroads failing to continuously operate trains. A temporary restraining order was issued, and, since the constitutionality of the statutes and the orders and acts of the Railroad Commission of Texas were questioned, a final hearing before three judges was had, as provided by section 266, Judicial Code (Comp. St. § 1243). Decree for plaintiff.

Goree, Odell & Allen, of Fort Worth, Tex., for plaintiff.

Dan Moody, Atty. Gen., and Charles W. Trueheart and Paul D. Page, Jr., Asst. Attys. Gen., of Texas, for defendants.

Before FOSTER, Circuit Judge, and WEST and HUTCHESON, District Judges, sitting under section 266, Judicial Code.

WEST, District Judge. The plaintiff seeks equitable relief, suit filed May 10, 1926, on grounds that the entire period of operation from 1912 to July, 1926, resulted in continuing losses, with no reasonable prospect that revenues will in future meet the costs of maintenance, replacements, and operation and give a fair return on the investment; that the laws of Texas require daily train service under prohibitive penalties; that the Railroad Commission of Texas is without power to authorize abandonment; that, plaintiff having given notice of its intention to abandon operation on July 1, 1926, defendants threatened to enforce the drastic penalties of the laws, and thus compel operation, which would constitute a taking of its property without due process of law; that the salvage value of its property, $34,738, would be lost unless plaintiff is permitted to dismantle its road; that a denial of such rights would deprive plaintiff of its property, its value and use, without due process of law, and without compensation, contrary to the Fourteenth Amendment to the Constitution of the United States.

The defendants plead the general issue to the essential bases of the cause of action, and further that the laws, the enforcement of which is sought to be enjoined, were in effect at the time of plaintiff's incorporation, and thus forming a part of the charter contract; that substantial improvements have been erected by the citizens of May; that abandonment would result in heavy losses to them;

that conditions have improved and will continue to improve in the future; that plaintiff is obligated by contract to continue operations, in that the original incorporators of the railway company delivered their stocks, rights of way, and graded roadbeds to "representatives of the Frisco" on that express condition.

The major fact to be determined is whether the continued operation of the road will entail such loss as would result in depriving the company of its property without due process of law and without adequate compensation, and whether there is a reasonable prospect for the future that the road can earn enough to pay operating and maintenance expenses and an excess over that to allow a fair return on the investment.

[1-4] The law of the case is settled in State of Texas v. Eastern Texas Railroad Company, 258 U. S. 204, 42 S. Ct. 281, 66 L. Ed. 566, State of Texas v. Eastern Texas Railroad Company (D. C.) 283 F. 584, and State of Texas v. Eastern Texas Railroad Company, et al., 264 U. S. 79, 44 S. Ct. 247, 68 L. Ed. 569, also Colorado v. U. S., 271 U. S. 153, 46 S. Ct. 452, 70 L. Ed. 878. They are authority for the propositions that the Interstate Commerce Commission has no power or authority to issue an order for the abandonment of a railroad that is engaged wholly in intrastate commerce. It was declared in Texas v. Eastern Texas Railroad, 264 U. S. 85, 44 S. Ct. 247, 68 L. Ed. 569, supra, that the charter of a railroad company does not oblige the company to operate its railroad at a loss; nor is such obligation to be implied from the acceptance of such charter and operating under it; also that, if it appears reasonably certain that future operation will be at a loss, a railroad company, in the absence of a contract, may cease operations, dismantle its road, and realize its salvage value; also, if the railroad be compelled by the state in such circumstances to continue operation at a loss, it would be depriving it of its property without due process of law.

The accuracy of the documentary data embraced in the many exhibits recording the results of operation, and in the accounting, is without contest. The same might be said as to the law of the case.

[5-7] In considering the defenses and contentions of the defendants, it is held: That the charter and its acceptance is not such a contract as would compel the railroad to continue to operate its property indefinitely at a loss, nor constitute a waiver by plaintiff of the guaranties secured to it by the federal Constitution. That persons have erected substantial improvements along the railway, and

in territory tributary, in the expectation of continued operation, does not burden plaintiff with an implied obligation to do so. That abandonment of itself, with resulting damages to the communities served, gives no cause of action to the individuals affected. Texas v. Eastern Texas Railroad Company [D. C.] 283 F. 599.

Defendants' claim that the original incorporators of the railroad delivered their stock, rights of way, and graded roadbed to "representatives of the Frisco System," upon the express condition of extensions and continued maintenance and operation of the road, was supported by testimony wholly lacking in certainty as to the parties, the terms, and as to the particular words and phrases which fastened on plaintiff the burden of continuing operation of its road without limitation. The court finds that there was a contract or agreement of the kind stated, but that the evidence does not show that plaintiff was obligated to run the road continuously without limitation, nor that plaintiff has by that contract waived rights accorded under the federal Constitution invoked by it here.

Following the procedure adopted in the Eastern Texas Railroad Case, the plaintiff filed, on August 30, 1924, with the Interstate Commerce Commission, an application for a certificate of public convenience and necessity, authorizing the abandonment of operation of its railroad in *inter*state commerce. This was referred to the Texas State Railroad Commission, with request to take testimony on the issues raised by the application. These are the same as are presented here, except that abandonment referred to *inter*state commerce *there* and *intra*state commerce here. The federal Commission made all findings upon the application for abandonment, "having regard for the needs of both intrastate and interstate commerce * * *" (Colorado v. United States, 271 U. S. 168, 46 S. Ct. 452, 70 L. Ed. ——, May 3rd, 1926), but, *inter*state traffic having been abandoned, this court answers that question solely from the viewpoint of *intra*state commerce. Nevertheless, the facts as to property values, the statistical records of economic data, accounts of returns from revenues, expenses, costs of operation, maintenance, and forecasts of future prospects, must be independently found by the court.

The Commission's certificate of abandonment issued March 25, 1926. Its findings, though not binding here, the parties, the issues, and the evidence upon which the Commission acted being practically the same, gives the Commission's findings especial

weight. It is a tribunal quasi judicial in character, with well-nigh boundless power and responsibility in the regulation of the national transport. Its recognized experience and eminent ability concerning a specialized subject gives to its reports, orders, and findings, a place corresponding to decisions of our high courts of justice. In the present circumstances, the court feels warranted in considering the action of the Commission as advisory, in analogy to reports of special masters in equity, and, so considering, holds that the findings of the Commission should be and are adopted and confirmed as the findings of this court, so far as applicable to issues common to both inquiries. The report, being a part of this opinion, should be included verbatim as a part hereof, but to do so would make for unusual volume. The report may be found in volume 105, Interst. Com. Com'n R. Reports, 729, being finance docket No. 4296, styled: "Abandonment of Line by Brownwood North & South Ry. Co. Submitted January 2, 1926. Decided March 25th, 1926. Certificate issued authorizing the abandonment as to interstate and foreign commerce, of a line of railroad in Brown county, Texas."

The latest date of recorded testimony before the Commission is November 19, 1925. The evidence before the court was supplemented by similar exhibits covering operation data of the railroad down to June 30, 1926, the date of abandonment in interstate commerce. The witnesses, excepting Bettis and Lockwood, appearing before the court and the examiner on September 27 and 28, 1926, who took the testimony, are all operating railroad officers of the plaintiff and of the Frisco System. Various exhibits were filed, which embrace maps of territory affected, and show the relation of the plaintiff railroad to and connections with other railroads, also the locations of towns and settlements mentioned by the witnesses. An income account for the six years from 1920 to 1925, inclusive, and the following six months to June 30, 1926, is exhibited, also freight traffic data for the same period, and likewise a showing of interstate revenues for the same period. An exhibit of statistics (Exhibit 28), prepared by H. W. Press, the assistant comptroller of the St. Louis-San Francisco, and assistant auditor of the Brownwood North & South Railroad Company, shows earnings, expenses, net railway operating incomes, and other data for the six years commencing 1920 to 1925, inclusive, and four months ending April 30, 1926. There are exhibits showing estimate of costs of repairs and replacements of water station at May, and an exhibit (page 34) giving the valuation by the Interstate Commerce Commission as of date June 30, 1918. A brief mention will be made of some of this testimony upon the question as to what has been the results of operation by the railroad company during the years in question.

It will be observed that from its inception the road has been continuously operated at a loss. The deficit in operation, as shown by Exhibit 28, is as follows:

| | |
|---|---|
| 1920 | $38,960.13 |
| 1921 | 26,554.18 |
| 1922 | 12,699.98 |
| 1923 | 7,945.39 |
| 1924 | 6,776.29 |
| 1925 | 3,936.28 |
| 4 months from January 1, 1926, to April 30, 1926 | 1,353.43 |

—which shows a total net loss during the six years and four months of $98,225.68. The interest on outstanding bonds and fixed charge obligations during the same period are stated to be $34,587.60, unpaid, leaving a net loss, including interest charges, of $124,818.15 during the period mentioned.

Referring to Exhibit 28, page 2, the witness Press gives the operating expenses according to the grouping, classification, forms, and requirements of the Interstate Commerce Commission. The intrastate freight and passenger business for the years 1923, 1924, and 1925, and the four months ending April 30th, resulted in a net loss of $43,306.33. Page 3 shows net results of operation for six years and four months, ending June, 1925, from *all business*, upon estimated yield of 6 per cent. on the book investment in the road and equipment, gives a total net loss of $211,447.15. The loss based upon the Interstate Commerce Commission's valuation, for the same period, would be $183,469.75. The latter half of the page contains like data showing the results of operation in intrastate business upon the same basis of estimated yield at 6 per cent. on the book investment and Interstate Commerce Commission valuation. For the three years' period, there is a showing of shortage of yield on the book investment as to intrastate business of $70,728.88, and on Interstate Commerce Commission's valuation, the shortage of $58,582. Page 4 of this exhibit is a showing of incomes for all business reduced to an average per mile operated for the six years' period from 1920 to 1925, inclusive, operating revenue per mile being $487.06, the operating expenses per mile $1,401.81, net operating loss per mile being $914.75, which, added to other income and items of expenses, give a total operating income net loss of $1,013.80 per

mile; including interest, would give a further loss per mile of $1,145.13. Page 5 is a showing of income accounts for intrastate business upon a mileage basis for the three years, 1923 to 1925, and shows a net loss from all sources during all this period of $7,049.96 per mile from intrastate business. Page 6 of this exhibit reduces all 'business income accounts to an average per day for the six years, 1920 to 1925, inclusive, plus the four months ending April 30, 1926; there is an average loss during that period of $53.99 per day. Page 7 shows an income for intrastate business per day for the three years, 1923 to 1925, and the four months ending April 30, 1926, at an average loss per day of $35.61 during that period. Page 8 gives for all business the number of tons of revenue freight and the number of passengers carried per day, for the six years referred to; the average number of tons of revenue freight per day is 10.7. The average number of passengers carried per day is as follows:

| | |
|---|---:|
| 1920 | 16.0 |
| 1921 | 6.7 |
| 1922 | 5.0 |
| 1923 | 4.9 |
| 1924 | 2.4 |
| 1925 | 1.1 |
| 4 months ended April 30, 1926 | .7 |

The operating revenues were greater for the year 1920 than for any subsequent year. With the single exception of 1925, the revenues since 1920 have not varied more than $1,500 for any one year. There was an increase in revenues during 1925 of about $4,600, but the testimony of Hutchison, assistant auditor, Exhibit 13A, page 38, and of Preston, traffic manager, shows that this increase was due to a single shipment of pipe to the Humble Pipe Line Company, for use in construction of an oil pipe line from San Angelo to a connection with another line of that company on the Missouri, Kansas & Texas Railroad.

An issue was raised before the Interstate Commerce Commission as to proper allocation of revenues. Exhibit 9 was offered by plaintiff as a complete analysis, showing the allocation of revenues between the plaintiff and all connecting lines during the years 1923 and 1924; those years being selected as fairly representative of the normal traffic conditions. This statement was analyzed by the oral testimony of H. W. Press, assistant comptroller of the St. Louis-San Francisco Railway Company, Exhibit 13A. It seems unnecessary to burden the record with a detailed statement of his testimony, since the Interstate Commerce Commission referred to the divisions of freight revenues during the

identical periods mentioned, and expressed the view that no basis of divisions that would be just, reasonable, and equitable with the other companies of the system would give the applicant sufficient revenue to meet its operating expenses, taxes, and equipment hire, and afford it any return upon the property that it holds and uses in the transportation service. When the inquiry is narrowed to the lessened returns to come from intrastate service alone the conclusion rests on still firmer ground.

Economy of operation was questioned. Mr. McCarty, the vice president and general superintendent of the railroad, being familiar with the reports of operation and with the physical conditions, declared that operating expenses could not be reduced below the figures given, nor could maintenance charges with safety to freight and passengers. He stated that some bridge renewals would be necessary for 1925, and also a large number of tie replacements would be necessary. The plaintiff owns no equipment, but rents an engine, for which it pays $2.41 per day, and one coach, for which it pays $1.06 per day.

The testimony is convincing that expenses for maintenance and operation were economical, and that there was no economy in using motorcars.

It is evident that heavy expenditures are necessary for future operation, because the maintenance has reached the extreme limit of safety to passengers and freight. Heavy replacements of ties and a renewal of bridges are necessary. Division Engineer Bliss submitted his estimates as to these repairs and replacements. They show the necessity for an expenditure of $70,883 (Plaintiff's Exhibit 30).

The accuracy of the documentary evidence offered by the plaintiff was not questioned. The issue of future prospects of the railroad and of results to the communities served because of abandonment was elaborated in the original evidence submitted to the Interstate Commerce Commission. Many witnesses testified that abandonment would occasion heavy loss to people who had made improvements on the faith of the continued operation of the road. Some witnesses thought that the future prospects for development of the country were good. To the contrary, officers of the company were positive in their statements that, judging the future by the experience gained from operation of the railroad since 1912—with the further limitation to carriage of intrastate freight and passengers—continuing loss was inevitable. The evidence shows that, with the exception of some cotton, a few

shipments of cattle, and a few cars of grain, there is nothing else in sight, though an average of three or four cars per month of gasoline is being hauled, but with no prospect of increase in tonnage to be handled from any quarter.

An inspection of the map of the territories served shows that the country tributary to this railroad is also tributary to competitive roads—the Missouri, Kansas & Texas Railway on the north, and the Santa Fé on the south. The results of the past seem to show that the territory in question has not produced tonnage enough to warrant continued operation in future, nor that there is any fair prospect of any such increase in tonnage as would increase revenues. The evidence also shows, without contest, that the automobile has taken all of the passenger traffic, and as to freight, except in carload lots, is carrying the most of that. There is evidence showing that there is a state highway for automobiles, in very fair condition, and is very much used between Brownwood and May and farther on through the small towns on the Missouri, Kansas & Texas Railroad to the north. Stress is laid upon the fact that the Dixie Gasoline Company will be obliged to abandon its investment because of inability to get its product to the market economically. The evidence is conflicting as to this, and it is by no means certain that by pipe-lining their casing-head gas it could not be economically transmitted to one of the other railroads only a few miles away. The Commission so found.

[8] The great preponderance of the evidence rests with the plaintiff. The court is satisfied that there is no reasonable certainty that the future revenues of the railroad will meet operating expenses, the costs of replacements and maintenance, and in addition thereto yield a fair return on the investment. That to compel plaintiff to continue operation and to deny it the right to abandon its franchise and salvage its properties, by enforcing the laws of the state, would result in a taking of its property without due process of law, contrary to the Fourteenth Amendment of the Constitution of the United States.

The law and the evidence being with the plaintiff railroad company, it is entitled to the relief prayed for in its amended bill of complaint. The decree final should make it clear that plaintiff has the right to and may abandon the operation of its railroad in intrastate commerce for any and all purposes, that it has the right to salvage its properties, to take up, remove, and dispose of tracks and structures, and dismantle the line, and all other properties; that the restraining order and injunction, heretofore issued and continued in effect should be made permanent.

Final orders and decrees, carrying into effect the court's views, will be entered.

FOSTER, Circuit Judge, and HUTCHESON, District Judge, concur.